## The Burley Tobacco Society *v.* Gillaspy.

[No. 7,708.   Filed December 12, 1912.]

1.   CONTRACTS.— *Tobacco    Pools.— Consideration.— Sufficiency.—* A contract, entered into between a tobacco grower and a society organized to promote the interest of tobacco growers and to act as agent for them in marketing their crops at fair and remunerative prices, by the terms of which the grower was to receive a benefit from a chain of similar contracts entered into by many other growers of tobacco, through the society as a common selling agent

charged with the duty of receiving, handling, warehousing, insuring, grading and selling the same, and was entitled to all the privileges of membership in the society and to have his tobacco sold at a price not less than that fixed by the society for like grades of tobacco, was supported by an adequate consideration moving to the grower. p. 587.

2. DAMAGES.—*Breach of Contract.—Liquidated Damages.*—Where the sum named in a contract is declared to be fixed as liquidated damages, and is not greatly disproportionate to the loss that may result from a breach, and the damages are not measurable by any exact pecuniary standard, the sum named will be deemed to be liquidated damages. p. 588.

3. CONTRACTS.—*Tobacco Pools.—Breach.—Damages.*—Where a grower of tobacco entered into a contract with a tobacco society, whereby he became a member of the society and pooled his crop with that of the other members, and the benefits of membership were to a great extent contingent on the willingness of all members to abide by the terms of their contracts, and damages for breach would be difficult of ascertainment and could not be measured by any exact standard, a certain sum named in such contract to be paid as liquidated damages for its violation is a stipulation for liquidated damages, and not a penalty. p. 589.

4. CONTRACTS.—*Validity.—Public Policy.*—The public policy of a state which renders contracts void, is declared and made certain when disclosed by a sustained line of decisions by the judicial branch of government, or by the legislative branch, when it finds definite and exact expression in statutory enactments. p. 589.

5. CONTRACTS.—*Validity.—Presumptions.—Public Policy.*—The power of declaring a contract void as against public policy should be exercised only in cases free from doubt, since it is the presumption that a contract between parties capable of contracting is legal and enforceable, unless the instrument itself discloses illegality. p. 590.

6. CONTRACTS.—*Tobacco Pools.—Validity.—Public Policy.*—A contract entered into between a tobacco grower and a society organized to promote the interest of tobacco growers and to act as agent for them in marketing their crops at fair and remunerative prices, whereby the society is made the sole agent to warehouse, grade and sell his crop, and providing that same shall not be sold for less than the price fixed by the society for like grades, is not contrary to public policy on the ground that it was executed in furtherance of a combination in restraint of trade, since the purpose of the combination does not appear to be other than to obtain relief from oppression by securing a fair and adequate price for the grower's product. pp. 591, 594, 595.

7. EVIDENCE.—*Judicial Knowledge.—Tobacco Trust.*—Courts take judicial cognizance of the history of the country and of the facts

of common knowledge which go to make up such history, and they judicially know that in the year 1909 a combination, known as "The Tobacco Trust", existed among the manufacturers of tobacco and controlled the leaf tobacco market. p. 594.

S. PLEADING.— *Complaint.*— *Demurrer.*— *Admissions.*—A demurrer to a complaint admits the truth of all facts well pleaded. p. 594.

From Dearborn Circuit Court; *George E. Downey,* Judge.

Action by The Burley Tobacco Society against Harry Gillaspy. From a judgment for defendant, the plaintiff appeals. *Reversed.*

*W. A. Byron, Givan & Givan,* and *Smith, Duncan, Hornbrook & Smith,* for appellant.

*Morris W. McManaman, Warren N. Hauck* and *Louis B. Ewbank,* for appellee.

ADAMS, J.—Suit by appellant against appellee to recover the sum of $480, as liquidated damages for the breach of the following contract:

"Book No. 1173.                              1909 Crop.
County ——————           Harrison, O., Oct. 14, 1909.
This contract made this day witnesseth: That in consideration of the benefits to be derived herefrom by the parties hereto, and that this contract is made by the undersigned and accepted by the hereinafter named Board of Control and Tobacco Society, as a mutual contract with other contracts of like import, taken, and to be taken and entered into by and with many other growers of tobacco, which are of mutual benefit to all, the undersigned growers of tobacco, owning 18 acres of Burley Tobacco of the 1909 crop grown on the farm in possession of the undersigned in Dearborn County, Ind., adjoining land of John Lemond, hereby constitute and appoint the —————— County Board of Control and Burley Tobacco Society, corporations under the laws of Kentucky, as sole agents for the purpose of receiving, commingling, handling, warehousing, inspecting, insuring, grading, financing and selling all of the said tobacco in such manner and on such terms as said Burley Tobacco Society may prescribe pursuant to its Charter and By-laws and for such purpose hereby transfer and assign to and invest in said agents the title and right of

possession to said tobacco pursuant to their Charter and By-laws, and agree to deliver the same on demand at such point in said county as said Society may designate; provided said tobacco shall not be sold below the general price fixed by said Society on like grades of tobacco. This pledge shall also include all tobacco grown or owned by undersigned of said year's crop, that may not be specified above. The undersigned, by reason of this contract, becomes, and is entitled to all the privileges as a member of said Tobacco Society. The undersigned further subscribes for shares of the capital stock, to the amount equal to 10% of the gross sales of the tobacco hereby pledged, in the Burley Tobacco Company, to be incorporated, and authorize the Burley Tobacco Society to pay for said stock out of the proceeds of said tobacco when sold. Upon our failure to fully comply with the terms and conditions of this contract, we hereby agree to pay to said Society as liquidated damages, twenty per cent (20%) of the value of said tobacco for the benefit of the members of said society. The Board of Directors of the Burley Tobacco Society are authorized to dissolve the pool as to this year's crop, if in their opinion a sufficient quantity of tobacco has not been pledged; provided such dissolution is declared on or before October 1, 1909, and this pledge shall be deposited for safe keeping in a bank in this county, selected for that purpose by said County Board of Control and the Executive Board of the Burley Tobacco Society, to await and subject to the final action of said Directors of Burley Tobacco Society. The Solicitor has no authority to change the terms of this contract.
P. O. New Trenton, Ind.        Harry Gillaspy, Landlord.
The Burley Tobacco Society, and ————— County
   Board of Control.
By Alfred Eisen, Solicitor.
        B. F. Bauar, Witness.        Pledge No. 117321.''

It is averred in the complaint that plaintiff is a corporation, organized under the laws of the State of Kentucky, not for profit, but to foster and promote the interests of all growers of Burley tobacco, by the dissemination of information concerning the growing of said tobacco, to encourage the betterment of its quality, to act as agents for the growers of Burley tobacco in the marketing of their crops, and to aid and assist all growers in obtaining a fair and remu-

nerative price therefor; that plaintiff gave defendant due and reasonable notice to deliver his crop of tobacco, grown in 1909, to the plaintiff at West Harrison, Dearborn county, Indiana, as provided in said contract; that plaintiff has complied with and performed all the terms and conditions therein to be performed by it, but that defendant has failed, neglected and refused to comply with the terms thereof; that he failed and refused to deliver his said crop of tobacco at West Harrison, Indiana, or at any other place, and, in violation of said contract, and of the conditions thereof, sold and delivered said tobacco to other parties, who were not members of plaintiff corporation; that he received as the proceeds of the sale of said tobacco the sum of $2,400. The court sustained defendant's demurrer to this complaint, and, plaintiff refusing to plead over, judgment for costs was rendered in favor of defendant.

The appeal from this judgment involves but a single question—whether or not the complaint states a cause of action. The objections urged by appellee against the sufficiency of the complaint, and in support of the judgment, are (1) that the contract set out in the complaint, as to appellee, was executed without consideration; (2) that the contract provides a penalty for nonperformance; (3) that the contract is in restraint of trade and against public policy.

As to the first proposition, the inquiry arises, What benefit accrued to appellee, or was to accrue, in consideration of the contract that he would not be entitled to receive except by reason of the contract? It is obvious that some benefit was to accrue to appellee, by the chain of similar contracts entered into by many other growers of tobacco, through a common selling agent charged with the duty of receiving, handling, warehousing, insuring, grading and selling the same. The contract also provides that appellee is entitled to all the privileges of a member of the Burley society, and is entitled to have his tobacco sold at a price not less than that fixed by appellant for

like grades of tobacco.  The manifest purpose of the contract was to strengthen and increase the efficiency of the Burley pool for 1909, and thus enable appellee to obtain a greater price for his tobacco as a member of the pool than by selling his crop separately.  We think there was an adequate consideration moving to appellee for the execution of the contract.  It is also urged by appellee that twenty per cent of the value of appellee's crop to be paid in the event of nonperformance of the contract is a penalty, and as there was no averment of actual damages the complaint is insufficient, and the action cannot be maintained.

2.  Whether a stipulated amount of money to be paid by one party to an agreement for nonperformance is to be considered as liquidated damages or as a penalty, is not always clear.  The following is the general rule, as declared in 1 Sedgwick, Damages (9th ed.) §405: "Whenever the damages were evidently the subject of calculation and adjustment between the parties, and a certain sum was agreed upon and intended as compensation, and is in fact, reasonable in amount, it will be allowed by the court as liquidated damages.  This rule will be found to be applicable to all contracts, and really involves the consideration of the subject in the three following aspects—that of the intent of the parties; that of the reasonableness of the contract; and that of the weight allowed by the court to the language employed."

In this State the rule is declared in *Jaqua* v. *Headington* (1888), 114 Ind. 309, 16 N. E. 527, that "where the sum named is declared to be fixed as liquidated damages, is not greatly disproportionate to the loss that may result from a breach, and the damages are not measurable by any exact pecuniary standard, the sum designated will be deemed to be stipulated damages."  See, also, *Mondamin, etc., Dairy Co.* v. *Brudi* (1904), 163 Ind. 642, 649, 72 N. E. 643; *Bird* v. *St. John's Episcopal Church* (1900), 154 Ind. 138, 56 N. E. 129; *Johnson* v. *Gwinn* (1885), 100 Ind. 466; *McCormick*

v. *Mitchell* (1877), 57 Ind. 248; *Chicago, etc., R. Co.* v. *Mc Ewen* (1905), 35 Ind. App. 251, 261, 71 N. E. 926; *Merica* v. *Burget* (1905), 36 Ind. App. 453, 463, 75 N. E. 1083; *J. I. Case, etc., Mach. Co.* v. *Souders* (1911), 48 Ind. App. 503, 96 N. E. 177.

The benefits of membership in appellant society were, to a large extent, contingent on the willingness of all to abide by the terms of their contracts. Every grower who 3. joined in the agreement and then violated the same by failure to deliver his product necessarily increased the expenses of the other members, and made it more difficult for the agent to accomplish the purpose of the pool, and obtain a fair and adequate price for the pooled tobacco. In such a case, the damages would be difficult of ascertainment, and could not be measured by any exact standard. Under the rules declared in the foregoing cases, we think this contract is one warranting a stipulation for liquidated damages.

The remaining question involved in this appeal calls for an examination of the contract which constitutes the foundation of the action. In sustaining the demurrer to the complaint, the trial court held that the contract was in restraint of trade, and therefore against public policy. If the contract set out in the complaint can be said to restrain trade unreasonably, then it is against public policy, and condemned alike by the common law, and by the anti-trust statutes of Indiana, and there was no error in sustaining the demurrer to the complaint.

The determination of what contracts are, and what are not against public policy is usually attended with much difficulty, as the term "public policy" will not admit 4. of exact definition. Public policy in one part of the country may or may not be the public policy of another part. Likewise, the public policy of one time may or may not be the public policy of another time. Our complex and changing civilization is especially marked and dis

tinguished by our view of public policy, which is not the
same today as it was a decade ago, or as it probably will be
a decade hence.    Whatever it may be or may not be, all
authorities agree that public policy in a state is declared and
made certain when disclosed by a sustained line of decisions
by the judicial branch of government, or by the legislative
branch, when it finds definite and exact expression in statu-
tory enactments.   And when the public policy of a people is
thus crystalized into law, such law will be deemed to be the
final word in expressing the popular policy in that behalf.

In the case of *United States* v. *Trans-Missouri Freight
Assn.* (1890), 166 U. S. 290, 340, 17 Sup. Ct. 540, 41 L. Ed.
1007, Mr. Justice Peckham, speaking for the court, an-
nounces the rule as follows: ''The public policy of the
Government is to be found in its statutes, and when they
have not directly spoken, then in the decisions of the courts
and the constant practice of Government officials; but when
the lawmaking power speaks upon a particular subject, over
which it has constitutional power to legislate, public policy
in such a case is what the statute enacts.''

Justice Story, in his work on contracts (1 Story, Contracts
[5th ed.] §675), says: ''Public policy is in its nature so
uncertain and fluctuating, varying with the habits and
fashions of the day, with the growth of commerce and the
usages of trade, that it is difficult to determine its limits with
any degree of exactness.   And it has never been defined by
the courts, but has been left loose and free of definition in
the same manner as fraud.   This rule may, however, be safe-
ly laid down, that wherever any contract conflicts with the
morals of the time, and contravenes any established inter-
est of Society, it is void as being against public policy.''

It is said in an Iowa case that ''the power of courts to
declare a contract void for being in contravention of sound
public policy is a very delicate and undefined power,
and, like the power to declare a statute unconstitu-
tional, should be exercised only in cases free from

doubt.'' *Richmond* v. *Dubuque, etc., R. Co.* (1871), 33 Iowa 422. Our own Supreme Court, in *Republic Iron, etc., Co.* v. *State* (1903), 160 Ind. 379, 387, 66 N. E. 1005, 62 L. R. A. 136, says: '' 'If there is one thing which more than another,' says Justice Shiras in *Baltimore, etc., R. Co.* v. *Voigt* [1900], 176 U. S. 498, 505, 20 Sup. Ct. 385, 44 L. Ed. 560, 'public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.' '' Thus we find the fundamental right of private contract contending to a greater or less extent with public policy, wherever the private right is impinged upon. And in such case the private right is favored by the presumption that contracts between parties capable of contracting are legal and enforceable, unless the contract itself discloses its illegality.

In *Bigelow* v. *Calumet, etc., Min. Co.* (1909), 167 Fed. 721, 94 C. C. A. 13, a case involving acts alleged to be in violation of the Sherman anti-trust law, the court *inter alia* said: ''In the absence of any such express terms of the agreement providing for acts directly affecting interstate commerce, complainants must by facts and circumstances show that the direct and necessary result of what has been done and threatened is to restrain interstate commerce. The burden of showing acts and circumstances which establish the fact that an unlawful result is contemplated and will ensue, unless checked, is upon those asserting the illegality of the contract of sale.''

The complaint in this case shows that appellant is a corporation organized pursuant to the laws of the State of Kentucky, not for profit, but for the purpose of fostering

6. and promoting the interests of all growers of Burley tobacco, to encourage the betterment of its quality, to act as agent for the growers of Burley tobacco in the marketing of their crops, and to aid and assist all such growers

in obtaining a fair and remunerative price therefor; and that such price should not be lower than that fixed by appellant on like grades of tobacco.

Prior to the execution of the contract in suit, the legislature of the State of Kentucky passed the following act: "It is hereby declared lawful for any number of persons to combine, unite or pool any or all of the crops of wheat, corn, oats, hay or other farm products raised by them, for the purpose of classifying, grading, storing, holding, selling or disposing of same either in parcels or as a whole, in order or for the purpose of obtaining a greater or higher price therefor than they might or could obtain or receive by selling said crops separately or individually." Carroll (1909) Ky. Stats. §3941a. In another section of the same act, all contracts having the same object in view were legalized, and it was provided that persons entering into such agreement might select an agent who should have the right to take, store, classify and dispose of the crops so placed, and that an injunction would lie to prevent a breach or violation of any contract made for such purpose. Carroll (1909) Ky. Stats. §3941a. At the time of the enactment of this statute, §198 of the constitution of the commonwealth of Kentucky provided that "it shall be the duty of the General Assembly from time to time, as necessity may require, to enact such laws as may be necessary to prevent all trusts, pools, combinations or other organizations from combining to depreciate below its real value any article, or enhance the cost of any article above its real value." Without setting out the anti-trust statutes of the State of Kentucky, enacted in obedience to this constitutional mandate, it is sufficient to say that such statutes are as drastic as our own, and prescribe as severe penalties. The pooling statute of the State of Kentucky has come before the court of appeals of that state several times to be construed, and to be determined as to its validity. While recognizing the peculiar character of the statute, the court justified its enactment by reason

of the situation and circumstances existing at the time of its passage, and of which the court took judicial notice. In *Owen County, etc., Society* v. *Brumback* (1908), 128 Ky. 137, 152, 107 S. W. 710, the court took judicial cognizance of the facts, saying: "The farmers, scattered all over the State, each acting independently and separately for himself, were unable to dispose of their crops at a fair and reasonable price. There was practically no competition among the purchasers of the crops. A combination and trust had been formed by the buyers to depreciate the value of the crops below their real value, and single-handed the producers were unable to combat or deal in terms of equality with these trusts and combinations that controlled the markets in which the farmer was obliged to dispose of his produce. To meet the condition of affairs thus presented, and to enable the farmers to combine their resources and place their products in the hands of an agent selected by them, to the end that better prices might be obtained, this act was passed." In the above case, the court held that a statute authorizing the pooling of crops for the purpose of depreciating any commodity below, or enhancing it above, its true value would be in violation of the constitutional provision, and any pool or combination entered into for such purpose would be invalid. But in the absence of some allegation or proof that such was the purpose of the combination, courts would indulge the presumption that the parties, by entering the combination and by the execution of such contracts, intended only to enter into such engagements as were lawful, and that such contracts should, in the absence of allegations and proof to the contrary, be construed as limited to lawful purposes under the statute and constitution.

In the later case of *Commonwealth* v. *Hodges* (1910), 137 Ky. 233, 246, 125 S. W. 689, the court said: "The conditions which gave rise to the act are known of all men. At the time of its enactment there was but one buyer for the

farmer's tobacco. It mattered not how hard he labored, how valuable his soil, or how fine the quality of the crop he raised, he was obliged to accept whatever that buyer might offer. Indeed in many instances the buyer absolutely refused even to examine his crop, or to make any offer at all. Instead of the plenty to which he was accustomed, and to which he was entitled, he stood face to face with privation and want. As individuals the farmers were unable to cope with the situation." While these cases carry the rule of judicial knowledge far, it is clearly the law that

7. courts will take judicial cognizance of the history of the country and of the facts of common knowledge which go to make up such history. To hold that courts do not judicially know that in the year 1909 there was in this country a combination among the manufacturers of tobacco, which controlled the leaf tobacco market, and known as "The Tobacco Trust", would be to impute to courts a lack of knowledge possessed by the public generally. Moreover, the authorities seem to recognize an exception in

6. cases presenting facts similar to the facts averred and judicially recognized in the case before us. In Greenhood, Public Policy 645, the rule is laid down that combinations to raise prices to a reasonable point are valid among men engaged in business which has become ruinous, especially when their operation is limited in every essential particular: This court, in the well-reasoned case of *Over* v. *Byram Foundry Co.* (1906); 37 Ind. App. 452, 77 N. E. 302, 117 Am. St. 327, held that every case involving the question of public policy and restraint of trade must be decided on its own facts.

Assuming, as we must, that the demurrer to the complaint admits the truth of all facts well pleaded, there is no averment in the complaint or provision in the contract

8. disclosing that appellant by means of the pool proposed to sell the tobacco of appellee for a sum greater than its true and actual value. As we have seen, all pre-

sumptions will be indulged in favor of the legality
6. of a contract, and such presumptions will only yield
    when its illegal character plainly appears.

In this case, we think it may be admitted that the contract in suit was executed in furtherance of a combination in restraint of trade by the growers of Burley tobacco, the market for which was controlled by a trust, but the purpose of the combination does not appear to be other than to secure a fair and adequate price for the growers' product. We think such acts could not be held to be in conflict with the morals of the time, or to contravene any established interest of society. Public policy does not ask those who till the soil to take less than a fair return for their labor. Public policy safeguards society from oppression; it is not an instrument of oppression.

If the complaint does not state the truth, that is not a matter of present concern. We only hold that the complaint as it comes to us is sufficient to put appellee to answer, and the issue may then be determined as one of fact and not as one of law.

The judgment is therefore reversed, with instructions to the trial court to overrule the demurrer to the complaint, and for further proceedings not inconsistent with this opinion.

NOTE.—Reported in 100 N. E. 89. See, also, under (1) 9 Cyc. 365; (2) 13 Cyc. 89; (3) 13 Cyc. 97; (4) 9 Cyc. 482; (5) 9 Cyc. 483; (7) 16 Cyc. 852, 864; (8) 31 Cyc. 333. As to agreements purporting to liquidate damages, see 108 Am. St. 46. As to the validity of agreements in restraint of trade or in promotion of monopolies, see 74 Am. St. 235. For a discussion of a stipulated forfeiture for the breach of a contract as a penalty or liquidated damages, see 1 Ann. Cas. 244; 10 Ann. Cas. 225; Ann. Cas. 1912 C 1021.