ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY

v. CLARK.

·Opinion delivered May 24, 1909.

1. CONTRACTS—MUTUALITY.—Where a contractor who undertook to make excavations for certain buildings was induced to put in his bid bv a promise of a railway company to furnish cars and take away the dirt, the contract is mutually binding. (Page 508.)

2. APPEAL AND ERROR—HARMLESS ERROR.—Admission of evidence which tended merely to prove an admitted fact was not prejudicial. (Page 509.)

3. EVIDENCE—COMPETENCY.—Where the undisputed testimony showed that defendant agreed to remove the dirt from an excavation, but there was a dispute as to whether a steam shovel was to be used in making the excavation, evidence that plaintiff applied to defendant's superintendent for a steam shovel, and that he tried to dissuade plaintiff from using such shovel because it was the wrong way to do the work, was competent as tending to prove that the use of a steam shovel was in contemplation of the parties at the time the contract was made. (Page 510.)

4. SAME.—In an action against a railway company upon a contract made by its superintendent, where there was some dispute as to the exact meaning of the contract, it was competent for the plaintiff to prove statements of subordinates of such superintendent which tended to show that they were carrying out their superior's orders, where such testimony tended to corroborate plaintiff's version of the contract. (Page 511.)

5. SAME.—Where a message relating to the contract sued upon was sent to the superintendent of defendant railway company, and was answered by the superintendent's chief clerk, who was with him in his private car, it was a question for the jury whether the reply was made under the superintendent's direction. (Page 511.)

Appeal from Pulaski Circuit Court, Second Division; *Edward W. Winfield*, Judge; affirmed.

STATEMENT BY THE COURT.

This suit was brought by G. W. Clark against St. Louis, Iron Mountain & Southern Railway Company to recover damages for an alleged failure to furnish cars to haul away certain excavation material as it had agreed to do.

Clark's version of the agreement and the attendant circumstances is substantially as follows:·

Certain real estate owners wished to make excavations on their property on East Markham Street in the city of Little Rock,

Arkansas, and consulted with the officials of St. Louis, Iron Mountain & Southern Railway Company about making the contract. The railway company wished to place side tracks in the rear of the buildings to be erected upon the property, and offered to take the dirt from the excavations to, make certain fills along its main track near the proposed buildings. In their advertisement for bids, the owners stated that the officials of the railway company had assured the owners of their desire to provide cars to remove the earth excavated, and notified the bidders to verify that statement. Before making a bid for the work, G. W. Clark wrote a letter to W. T. Tyler, General Superintendent of the railway company, asking for information of the correctness of the advertisement in regard to furnishing cars for the removal of the earth. The letter was not answered. Afterwards, and before making his bid, Clark went to Tyler, and asked him if he would furnish cars to take the dirt away if he was the successful bidder. Tyler agreed to furnish the cars and move the earth; and with that understanding Clark bid on the excavations and secured the contract. · He then went to Tyler to secure a steam shovel with which to make the excavations, stating to him that he understood that the railway company had several steam shovels that were then idle. After he had made his statement, Tyler said: "How much is there in it?" Clark replied: "I don't know, Mr. Tyler; I am willing to pay whatever it is worth; that is for you to say." Tyler then said: "We can't furnish the shovel." Tyler knew that he wanted the steam shovel to do the excavation work above mentioned. Clark then rented a steam shovel from the Dalhoff Construction Company, and proceeded with the work of excavation. After the shovel was received, Clark went to Tyler's office, and said to G. W. Herschmann, the chief clerk to Mr. Tyler, that he wanted some cars. Herschman said: "When?" Clark answered: "In two or three days." Herschman then said: "How are you going to load them?" Clark answered: "With a steam shovel," and Herschman replied: "All right; the cars will be there." On that same morning five cars were sent. There was an engine with them, and the engine "spotted" the cars for the steam shovel.

F. W. Greene, who was terminal superintendent for the railway company, came over to the place where the work was being

done sometime during the same forenoon, and said: "You have not got cars enough here to keep this shovel and engine busy," and Clark answered, "No, not half enough." Greene replied: "I will go back over the river and have five more fixed up and sent over." Five more cars were then sent over by Greene.

One cut was made, and about that time Greene came along, and said: "Clark, you will have another track here pretty soon." Clark answered: "Yes." Greene replied: "I can't do that without instructions from Mr. Tyler," and further said: "Mr. Tyler is out of town; I can wire him." The next morning he came to the work, and said to Clark: "We have got the material and can put it in, but there will be an additional charge for the labor, which we will want you to pay." Clark responded that he would pay it, but would do so under protest, but that if it was right that he should furnish the labor that would be the end of it. This was on Thursday, and on the following Saturday, Mr. Pollock, the yardmaster, came over, and said: "This is Saturday. Had we not better put it off until Monday?" Clark answered: "Get it over as early as possible Monday." Pollock replied: "All right; I will." On Monday, Pollock did not come back, and Clark went down, and called Mr. Greene up, and asked him what was the matter. Greene said: "It is all off." Clark answered: "All off? What is the matter?" Greene replied: Mr. Tyler says he is not going to do anything more."

After that no more cars were furnished, and Clark removed the dirt by wagons.

W. T. Tyler, the General Superintendent of the railway company, admitted that he agreed with Clark to haul away the earth, but said that he thought it would be excavated in the usual way, that is by hand, or with a dump trap. That he would not have made the agreement to take the dirt if he had known it was to be done with a steam shovel because the railway company was not able at the time to do the commercial work. He admitted having a conversation with Clark about a steam shovel, and in that conversation tried to discourage the use of it because the operation of the steam shovel was the wrong way to go at the job. That he knew nothing more about what was being done until the second or third day. That Mr. Greene, the superintendent of terminals, had attempted to supply Clark with cars,

and had either misunderstood his instructions or had taken in-
structions from some one else. That on or about the third day he
stopped the work because he could not furnish two engines for
the work, and it required that number, which was not according
to the agreement he had made with Clark. Tyler further testi-
fied: "On December 15th, I was in Charleston, Mo., and re-
ceived a telegram from Mr. Greene, which read as follows:

"95 Rush.                                      "Dec. 15, 1904.

    "W. T. Tyler,
        "On Line.

    "C. W. Clark, contractor for the new buildings near freight
house, requests us to furnish labor and material to build tem-
porary track upon which to place dirt cars for steam shovel. It
will be necessary for us to follow the steam shovel with this
track until excavation is made up to Markham Street. Material
can be used elsewhere when work is done, but it will take about
eighty-five dollars' worth of labor to lay this track and line it
around as he requests. Pls. adv. if I have your authority to go
ahead and do this. Have told Clark cannot do it without
authority.

                                      "F. W. Greene."

To that reply was made, not by Tyler, but by Mr. Hersch-
man, as follows:

                              "Charleston, 12-16-04.

"W. A. McKee, L. Rock.

    "Your note. Say to Mr. Clark that we will furnish the labor
and material for temporary tracks account excavation for Plun-
kett-Jarrell building, provided he will reimburse for cost of labor.
This was the understanding I had with Mr. Greene.

    "12:14 P. M.

                              "G. W. Herschman."

McKee was the second clerk in Tyler's office. Greene testi-
fied that he received his instructions from Herschman, and
Herschman said he received his information about the terms of
the contract from Mr. Clark. Other facts appear in the opinion.

    There was a jury trial, and a verdict in favor of the plaintiff
in the sum of $2,500. From the judgment rendered on the ver-
dict the defendant has duly prosecuted an appeal to this court.

*E. B. Kinsworthy* and *Lewis Rhoton,* for appellant.

Evidence of a previous contract is not admissible to prove the terms of the contract in suit. Neither is evidence of a subsequent contract admissible, unless it be to show that the matter in controversy was adjusted. 54 Vt. 677. Where it is apparent that one party has not agreed to the terms to which the other has, no contract is made. 37 U. S. App. 185; 101 U. S. 50; 46 Mich. 620. Neither party is bound unless both are. 4 Kans. 379; 96 Am. Dec. 175; 101 Ga. 810; 114 Fed. 77; 68 Ark. 277; 64 Ark. 398; 4 Ark. 251; 24 Conn. 514; 63 Am. Dec. 177. Parties are bound only so far as they intend to be bound. 34 Ark. 303; 30 Ark. 186; 69 Ark. 134.

*J. W. & M. House,* for appellee.

Tyler was the general superintendent of the defendant company, and had authority to make the contract. 1 Elliott on Railroads, 297-298; 59 Am. & Eng. Ry. Cas. 75; 26 *Id.* 18; 22 *Id.* 382; 13 *Id.* 132; 28 *Id.* 61; 34 *Id.* 127; 1 *Id.* 343; 37 *Id.* 282; 44 *Id.* 459; 20 *Id.* 653; 1 Elliott on Railroads, § 225; 1 Clark & Skyles on Agency, pp. 770-771-783; 7 Am. Dec. 66; 61 Am. St. 436; 112 N. C. 593; 24 Am. St. 134; 86 Am. Dec. 351. The declarations of an agent in and about the work in which he is engaged are admissible against the principal. 1 Elliott on Railroads, §§ 217; 26 Mo. App. 19; 25 *Id.* 619; 12 Am. & Eng. R. Cas. 301; 16 *Id.* 580; 34 *Id.* 127; 28 *Id.* 524; 92 Ill. 437; 34 Barb. 256; 119 U. S. 90; 113 Fed. 49. Want of mutuality is no defense to an executed contract. 55 Pa. St. 504; 5 Minn. 382; 73 S. W. 747; 125 Ia. 622; 102 Ia. 701; 114 Ia. 574; 119 Cal. 545; 119 Cal. 35; 94 S. W. 787; 3 S. W. 486; 80 S. W. 1045; 39 Am. Dec. 150; 119 Ga. 153. Appellant is estopped to deny plaintiff's right to recover. 25 Conn. 118; 14 Ill. App. 538; 123 Ill. 57; 22 Minn. 417; 23 Minn. 356; 49 Am. Dec. 234; 30 N. Y. Super. Ct. 7; 85 Pa. St. 27; 35 Vt. 204.

Hart, J., (after stating the facts). It is insisted by counsel for appellant that the contract in question is lacking in mutuality. We cannot assent to the soundness of that contention.

"Mutuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of this act or promise of the other, that is, neither party

is bound unless both are bound." 7 Am. & Eng. Enc. of Law, (2d Ed.) p. 114. Continuing on the next page, the same writer says: "Just as there must be two or more parties who contract, so there must be some sort of mutual interchange of benefits and concessions, the delivery of a consideration by one and the assumption of an obligation by the other to complete the transaction."

This rule is so well established both by text writers and by adjudicated cases as to render further citation of authorities unnecessary; but the lack of mutuality has no application under the facts as disclosed by the record.

Clark says that he made his bid for the excavation work upon the express promise of Mr. Tyler that he would furnish the cars and take away the dirt; that Tyler promised to furnish the cars in sufficient number and in proper time to complete the work. Tyler, at the time, was general superintendent of appellant railway company, and admits that he had this agreement with Clark. The authority of Tyler to make whatever contract he did make in regard to the matter is conceded by counsel for appellant. Clark acted upon the promise made by Tyler, and made his bid to do the work of excavation upon the express understanding that the railroad would take the material excavated. In this case Clark contracted with third persons to make certain excavations for them, and the bid for the work was offered and accepted after the railway company had agreed to haul away the material excavated. We cannot see any difference between this agreement and one where the railroad company owned the ground and should contract with Clark to make the excavation with the understanding on its part to haul away the materials excavated. Clark undertook certain obligations upon the promise of the railroad to perform certain acts in relation to the obligation assumed by him. Clark bound himself to perform his contract, and would have been liable in damages for a breach of it. The railroad became equally bound to perform whatever agreement it made as a matter of inducement to Clark to enter into the contract to do the excavation, and there was no lack of mutuality.

2. The owners of the lots upon which the excavation was made, in advertising for bids for the work, used the following

language: "Officials of the railway company have assured the owners of their desire to provide cars for and to remove the earth loaded thereon during the progress of excavations, should the contractors so desire. Each contractor will be expected to verify the above proposition."

This advertisement was admitted in evidence over the objections of appellant, and its counsel now predicate error on its admission. Conceding it to be error, it was harmless error. Appellee says that he met Mr. Tyler, the general superintendent of appellant, before his bid was made, and that Mr. Tyler confirmed the advertisement. Mr. Tyler admits this, and the only point of difference between him and appellee in regard to the agreement is as to the manner of the removal of the materials excavated.

Therefore, treating it as incompetent evidence, it was evidence of an admitted fact, and was not prejudicial. *Henry* v. *State,* 77 Ark. 453; *Waters-Pierce Oil Co.* v. *Burrows,* 77 Ark. 74; *Standard Life & Accident Ins. Co.* v. *Schmaltz,* 66 Ark. 588.

For the same reason, the testimony of Plunkett, the owner of the ground to be excavated, and Thompson, the architect, as to conversations had with Tyler before the contract was made was not prejudicial. That is to say, their testimony was in regard to undisputed matters.

3. Counsel for appellant assign as error the admission of testimony with reference to the lease of the steam shovel by appellee. They base their objection upon the testimony of Superintendent Tyler. He testified that he did not know that a steam shovel was to be used in making the excavation. That he had had years of experience in similar work, and had never known of a steam shovel being used upon work of this kind. On the other hand, appellee testified that the use of the steam shovel was practicable, and that it was the usual and cheapest way of doing work of that kind. Before the work was commenced, appellee says that he went to Tyler for the purpose of renting a steam shovel, with which to excavate the dirt and load it on the cars, and that Mr. Tyler said: "We can't furnish the shovel." Appellee says that he then left and hired a steam shovel from Dalhoff. Tyler admits having this conversation with appellee, but says that in the conversation he tried to discourage the oper-

ation of the steam shovel because it was the wrong way to do the work.

This testimony was competent as tending to show that the use of a steam shovel was in contemplation of the parties at the time the contract was made; for the jury might have inferred from it and the other circumstances adduced in evidence that if the use of the steam shovel had not been contemplated by Tyler he would have said in plain terms that the use of it was not according to his understanding of the contract, instead of merely advising against the use of it.

4. Counsel for appellant insist that the testimony of appellee as to certain conversations had by him with Herschman, Greene and Pollock was incompetent, and predicates error on the action of the court in admitting it before the jury. The portions objected to appear in the statement of facts in quotation. The testimony was competent. Herschman testified that he had no knowledge of the details of the contract except as given him by Clark. Clark's conversation with him as quoted was competent for the purpose of contradicting him and as tending to show that he was familiar with the terms of the contract before talking with Clark. It will be remembered that Herschman was the chief clerk in Tyler's office. Tyler admitted that he had given some instructions to Greene in regard to the furnishing of cars, and his conversation with Clark was admissible for what it was worth in tending to show that he was carrying out the instructions given him. The same may be said of the conversation with Pollock, the yardmaster. It is admitted that Tyler had authority to make the contract, and of course whatever instructions he gave to his subordinates in regard to carrying out the contract was binding upon the railway company, and the conversations referred to in quotation were admissible as tending to show that Hershman, Greene and Pollock were carrying out the instructions given them by Tyler, and thus corroborating Clark's version of the terms of the contract or agreement with Tyler.

The telegrams quoted in the statement of facts were admissible for the same reason. Tyler admits receiving the telegram from Greene, but says Herschman answered it. According to Tyler's testimony, he made an agreement with Clark to move the

earth, and then took no further notice of the matter until he ordered the work stopped. Herschman was with Tyler in his private car when Tyler received the telegram. It was a question for the jury to decide whether Herschman would have answered a telegram sent to and received by Tyler, without instructions to do so. Then the telegrams were admissible as tending to show that the furnishing of cars had been done and was being carried out under the directions of Mr. Tyler.

We have carefully considered the instructions, and, without reviewing them separately, it is sufficient to say that, when tested by the principles of agency already announced, we think they fully and fairly submitted to the jury the conflicting theories of the parties to the suit.

Finding no prejudicial error in the record, the judgment is affirmed.