228        TENNESSEE REPORTS.        [150 Tenn.

Dark Tobacco Growers' Co-op. Assn. v. Mason.

DARK TOBACCO GROWERS' CO-OP. ASS'N v. R. H. MASON.*

(*Nashville.* December Term, 1923.)

1. **MONOPOLIES.** Mere size and power of co-operative association does not render it unlawful combination or trust.

That co-operative marketing association is large and powerful, and may some time be guilty of coercion or suppression of competitors, arbitrary fixing and maintenance of prices, or other acts making combination illegal, does not render it unlawful combination or trust. (*Post, pp.* 246-248.)

Cases cited and approved: United States v. Keystone Watch Co., 218 Fed., 502; Standard Oil Co. v. United States, 221 U. S., 1; U. S. v. Am. Tobacco Co., 221 U. S., 106; International Harvester Co. v. Kentucky, 234 U. S., 216; Collins v. Commonwealth, 234 U. S., 634.

Cases cited and distinguished: U. S. v. U. S. Steel Corp., 251 U. S., 417; Tobacco Growers' Co-operative Assn. v. Jones, 185 N. C., 275.

Code cited and construed: Secs. 3185-3191(S.).

2. **MONOPOLIES.** Contract between tobacco grower and co-operative marketing association held not violative of federal or state anti-trust laws.

Contract to sell and deliver to Tobacco Growers' Co-operative Association, organized under Bingham Co-operative Marketing Act (Ky. Acts 1922, chapter 1), all tobacco produced or acquired by grower during certain years for pooling and resale at best prices obtainable, *held* not violative of Sherman Anti-Trust Law (U. S. Comp. St., section 8820 et seq.) or Tennessee Anti-Trust Law (Shannon's Code, section 3185). (*Post, pp.* 248, 249.)

Cases cited and approved: Bailey v. Master Plumbers, 103 Tenn., 99; Standard Oil Co. v. State, 117 Tenn., 618; Potter v. Dark Tobacco Growers' Co-op. Assn., 257 S. W., 33; Oregon Growers v.

Dark Tobacco Growers' Co-op. Assn. v. Mason.

Lentz, 107 Or., 561; Brown v. Staple Cotton Assn., 132 Miss., 859; Texas Farm Bureau Cotton Assn. v. Stovall, 253 S. W., 1101; Kansas Wheat Growers' Assn. v. Shulte, 113 Kan., 672.

Code cited and construed: Sec. 3185 (S.).

3. **AGRICULTURE.** Foreign co-operative marketing association held to have complied with state law for doing business therein.

Foreign co-operative marketing association filing charter in Tennessee several days before mailing notice to tobacco grower of its acceptance of marketing contract, which provided that signature thereof should be deemed acceptance as of date of mailing notice, *held* to have complied with State law when contract was made, though it was signed by grower before charter was filed. (*Post,* pp. 249-251.)

4. **FRAUDS, STATUTE OF.** Marketing contract held not within statute because not signed by co-operative marketing association.

Marketing contract between tobacco grower and co-operative marketing association, minutes of which, showing acceptance of contract, and written notice thereof to grower were signed, respectively, by presiding officer, secretary and directors, and by association, per its secretary, whose affidavit, which contract provided should conclusively establish acceptance and mailing of notice, was made and filed as part of record in association's suit for breach of contract, *held* not within statute, because association did not sign contract, which may be ratified by separate paper or writing. (*Post, pp.* 251, 252.)

Cases cited and approved: Blair v. Snodgrass, 33 Tenn., 1; Saunders v. Hackney, 78 Tenn., 194; Lee v. Cherry, 85 Tenn., 707; Otis v. Payne, 86 Tenn., 663; Sheid v. Stamps, 34 Tenn., 173.

5. **CONTRACTS.** "Mutuality of contract" defined.

"Mutuality of contract" means obligation on one party to do or permit doing of something in consideration of act or promise of other. (*Post, p.* 252.)

6. **CONTRACTS.** Promise valid consideration for promise.

Promise of one party is valid consideration for promise of other. (*Post, p.* 252.)

Dark-Tobacco Growers' Co-op. Assn. v. Mason.

7. **CONTRACTS.** Tobacco grower's contract with co-operative marketing association held not unilateral.

Contract by tobacco grower to sell and deliver to co-operative marketing association all tobacco produced or acquired by him during certain years, in consideration of association's agreement to buy all of it, make rules and regulations, inspect, pool, classify, and resell it at best prices obtainable, and pay over to grower net amount received, *held* not unilateral. (*Post, pp.* 252-254.)

Cases cited and approved: Campbell v. American Co., 117 Mo. App., 19; St. Louis Co. v. Clark, 90 Ark., 504; Cherry v. Smith, 22 Tenn., 19; Fourth Nat. Bank v. Stahlman, 132 Tenn., 367; Farabee-Treadwell Co. v. Bank & Trust Co., 135 Tenn., 208.

Case cited and distinguished: Texas Seed Co. v. Chicago Co., 187 S. W., 747.

8. **CONTRACTS.** Not invalid because harsh, oppressive, unjust, and inequitable.

That contract is harsh, oppressive, unjust and inequitable does not invalidate it. (*Post, p.* 254.)

9. **FRAUDS, STATUTE OF.** Evidence of parol collateral agreement between tobacco grower and co-operative marketing association held incompetent.

In Tobacco Growers' Co-operative Association's suit for breach of grower's contract to sell and deliver all his tobacco to it, evidence of parol collateral agreement to advance defendant sixty per cent. of graded value of tobacco on delivery *held* incompetent, such representations being within statute of frauds. (*Post, pp.* 254-256.)

10. **EVIDENCE.** Exclusion of testimony as to similarity of contract sued on to other contracts and representations by parties soliciting similar contracts held not error.

In suit by Tobacco Growers' Co-operative Association for breach of grower's contract to sell and deliver all his tobacco to it, exclusion of testimony as to similarity of contract to contracts with

other growers and representations to farmers by persons soliciting similar contracts *held* not error.   (*Post, p.* 256.)

### FROM ROBERTSON.

*Headnote 1.   27 Cyc, Monopolies, p. 890 (1925 Anno); 2.   27 Cyc, Monopolies, p. 899; 3.   2 C. J., Agriculture, § 26a (1925 Anno); 4.   27 C. J., Frauds, St. of, § 377; 5.   13 C. J., Contracts, § 179; 6.   13 C. J., Contracts, § 170; 7.   13 C. J., Contracts, § 191; 8.   13 C. J., Contracts, §§ 693, 706; 9.   22 C. J., Evidence, § 1677; 10.   22 C. J., Evidence, § 839.

Appeal from the Chancery Court of Robertson County. —Hon. J. W. Stout, Chancellor.

John E. Garner and Keeble & Seay, for Mason.

R. L. Peck, True & Dorsey, Abe Waldauer and Aaron Sapiro, for Association.

Mr. Justice Hall delivered the opinion of the Court.

The bill in this cause was filed in the chancery court of Robertson county by the Dark Tobacco Growers' Co-operative Association to recover of the defendant, R. H. Mason, the sum of $1,050, as liquidated damages, and the further sum of $525, expenses and attorney's fees, for breach of contract.

Complainant is a co-operative association for the handling, marketing, and selling of tobacco, incorporated and organized under the Bingham Co-operative Marketing Act of Kentucky (chapter 1, Ky. Acts 1922).

The bill alleges that defendant became a member of said association and contracted to sell to it all tobacco grown by him for a period of five years, beginning with the year 1922 and extending through the year 1926.

Complainant's right to recover of defendant is predicated upon a certain contract signed by defendant and filed as Exhibit A to the original bill.

Defendant admitted the signing of the contract, but denied liability to complainant for any amount, and set up the following defenses:

(1)  That complainant was a foreign corporation, and at the time of the execution of the contract, for the alleged breach of which this suit was brought, was doing business in the State of Tennessee without having complied with the law, which requires a copy of its charter to be filed in the office of the secretary of State, and could not, therefore, enforce the contract in the courts of Tennessee.

(2)  That complainant was a trust, created and acting in violation of the anti-trust laws of the United States, to-wit, the Sherman Act, and in violation of the anti-trust law of Tennessee, and for that reason the contract sued on could not be enforced.

(3)  That the contract was violative of the statute of frauds of both Kentucky and Tennessee.

(4)  That the contract was unilateral, wanting in mutuality, indefinite and uncertain, harsh, oppressive, unfair, and inequitable, and, therefore, should not be enforced.

(5)  That complainant had entered into certain other collateral and independent agreements and contracts with defendant, which had been breached by it, and, therefore,

complainant could not enforce the contract sued on against defendant.

Defendant having asked for a jury in his answer to the bill, the cause was tried before the chancellor and a jury; each side submitting issues. A number of these issues were answered by the chancellor with the consent of counsel. The remaining issues were submitted to the jury and answered by the jury. These issues, in so far as they are material, will be adverted to later on in this opinion.

After the jury had returned its verdict upon the issues submitted to it, defendant moved the chancellor to dismiss complainant's bill for the reason that the jury had found, as a fact, that there was a collateral agreement made between him and the association, at the time defendant signed the contract sued on, that it would advance him sixty per cent. of the value of his tobacco, and it appearing from the proof that complainant had breached its agreement in this regard defendant was not bound to perform the contract, which motion the chancellor overruled.

Defendant further moved the chancellor to dismiss complainant's bill for the reason that the jury had found, as a fact, that complainant was not ready, willing and able to perform the terms of the contract, which motion the chancellor overruled.

Thereupon defendant moved for a new trial, which motion the chancellor overruled, and rendered and entered a decree that the contract sued on was valid and binding on defendant, and that complainant was entitled to recover of defendant five cents per pound, as provided in said contract, as liquidated damages for all tobacco pro-

duced by or for defendant during the year 1922, which he failed and refused to deliver to complainant, and to recover of defendant reasonable attorney's fees, and referred the cause to the master to ascertain and report the number of pounds of tobacco which defendant failed to deliver, and what would be reasonable attorney's fees for the institution and prosecution of the suit.

From this decree defendant appealed to this court and has assigned errors.

By his first assignment of error defendant insists that the chancellor erred in not dismissing complainant's bill for the reason that the proof shows that complainant is a trust and an illegal association or combination, incorporated, organized, and acting in restraint of trade, and in violation of the anti-trust Laws of the United States, especially the Sherman Act (U. S. Comp. St., section 8820 et seq.), and in violation of the anti-trust law of Tennessee (Shannon's Code, sections 3185-3191).

The Bingham Co-operative Marketing Act, under which complainant was incorporated and organized, is an enabling act whereby a particular kind of corporation may be formed. Persons who are able and willing to bring themselves within the terms of the act may organize a co-operative association. Section 1 of the act makes the following declaration of policy, and sets out the purposes of the act as follows:

"In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation; and to eliminate speculation and waste; and to make the distribution of agricultural products between producer and consumer as direct as can be efficiently done; and to stabilize the marketing of agricultural products, this act is passed."

It is then provided that twenty or more persons engaged in the production of agricultural products may form a nonprofit co-operative association to engage in any activity in connection with the marketing and selling of the produce of the members of the association together with related activities. An association organized under the act can handle only the products of its members, and only producers are eligible to membership.

Articles of incorporation must be adopted containing the provisions required in articles of incorporaton of business corporations. In addition, there must be a statement showing whether the association is organized with or without capital stock; whether the property rights of the members shall be equal or unequal; if unequal, general rules must be made applicable to all members whereby property rights will be determined and fixed. These rules must apply to new members as well as old, and cannot be changed except by the consent of three-fourths of the members. If the association is to be organized with capital stock, all details concerning the amount of stock and its character must be set forth. The articles of incorporation must be filed in the same manner as those of a general business corporation.

Provision is made for the adoption of a code of by-laws containing a number of requirements protecting the rights of members, and the status of the association as a nonprofit corporation for co-operative marketing of its members' produce. After the usual stipulations for the time, place, and manner of calling and conducting meetings, the number of members constituting a quorum, the right to vote by proxy, and the powers and duties of officers and directors, there follow a number of by-laws which differ from those of an ordinary corporation.

The marketing contract between the association and its members may be embodied in the by-laws. The by-laws may likewise determine the method of permitting the withdrawal of members or transfer of stock, the conditions upon which members shall cease, and the automatic suspension of a member's right when he ceases to be a grower. Upon death, withdrawal, or expulsion of a member, his interest in the association must be appraised, and the value of that interest must be paid to his heirs, or to himself, as the case may be.

Directors may be elected by districts, so as to give the membership proportional and equitable representation.

Complainant association has two directors representing the public group, one from each of the States of Kentucky and Tennessee. These directors sit with the board in all of its deliberations with full voting power, and are charged with the protection of the interest of the general public.

The association is authorized to make contracts with its members requiring them to sell, for a limited period of time, all or part of their agricultural products. Since the association is not permitted to handle the products of nonmembers, it was necessary to make special provision for the enforcement of these contracts. The act, therefore, permits the making of contracts providing for the payment of liquidated damages in case of breach, and for reasonable attorney's fees and expenses of suit, in case suit is brought against the member for such breach.

Under the act the association must make annual reports giving a complete statement of its business during the past year, its total expenses, its indebtedness, etc.

Section 28 of the act reads as follows:

"Any association organized hereunder shall be deemed not to be a conspiracy nor a combination in restraint of trade nor an illegal monopoly; nor an attempt to lessen competition or to fix prices arbitrarily or to create a combination or pool in violation of any law of this State; and the marketing contracts and agreements between the association and its members and any agreements authorized in this act shall be considered not to be illegal nor in restraint of trade nor contrary to the provisions of any statute enacted against pooling or combinations."

Complainant is a nonprofit co-operative association. It has no capital stock; its members being growers of tobacco in the States of Indiana, Kentucky, and Tennessee.

Prior to its incorporation, there was circulated throughout said States a form of association agreement whereby the growers agreed to become members of the proposed association, and upon its incorporation to become bound to deliver to it all of the tobacco produced by them for the years 1922, 1923, 1924, 1925, and 1926.

Complainant was duly incorporated under said Bingham Act, after signatures of requisite number of growers to the association agreement and marketing agreement were obtained.  The material provisions of the marketing agreement, which is the gravamen of this suit, read as follows:

"1.  The grower is a member of the association and is helping to carry out the express aims of the association for the co-operative marketing, for minimizing speculation and waste and stabilizing tobacco markets in the interest of the grower and the public, through this and similar obligations undertaken by other growers.

"2. The association agrees to buy and the grower agrees to sell and deliver to the association all of the tobacco produced by or for him or acquired by him as landlord or lessor, during the years 1922, 1923, 1924, 1925, and 1926.

.    .    .    .    .    .    .

"4. (a) All tobacco shall be delivered at the earliest reasonable time after cutting or curing, drying or firing when customary, to the order of the association, at the warehouse or plant controlled or specified by the association; or at the nearest warehouse, if the association controls or specifies no warehouse or plant in that immediate district; or by shipment, as directed, to the association; and by delivery to the association of the indorsed warehouse or other receipt or bills of lading, properly directed.

" (b) Any deduction or allowance or loss that the association may make or suffer on account of inferior grade, quality or condition at delivery shall be charged against the grower individually.

" (c) The association shall make rules and regulations and provide inspectors or graders to standardize and grade the quality and method and manner of handling, curing and shipping such tobacco; and the grower agrees to observe any such rules and regulations and to adopt the grading established by the State and federal authorities and the association.

"5. The association shall pool or mingle the tobacco of the grower with tobacco of a like type, grade and quality delivered in the same crop year by other growers. The association shall classify the tobacco and its classification shall be conclusive.

"The tobacco delivered in any crop year to any point at the order of the association shall be handled by one major pool; and the minor pools shall first be by type and then by grade and quality within each type.

"6.    The association agrees to resell such tobacco, together with tobacco of this type, grade and quality delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions; and to pay over the net amount received therefrom (less freight, insurance and interest), as payment in full to the grower and growers named in contracts similar hereto, according to the tobacco delivered by each of them, after deducting therefrom within the discretion of the association, the costs of maintaining the assocation and of handling, grading and marketing such tobacco; and of creating funds for credits and other general commercial purposes (said funds not to exceed one per cent. of the gross resale price). The annual surplus from such deductions must be prorated among the growers delivering tobacco in that year on the basis of deliveries.

"7.    The grower agrees that the association may handle, in its discretion, some of the tobacco in one way and some in another; may sell some upon delivery; may cure or process or manufacture all or any portion thereof, but the net proceeds of all tobacco or tobacco products of like type, quality and grade, less charges, costs and advances, shall be divided ratably among the growers in proportion to their deliveries to each pool, payments to be made from time to time until all the accounts of each pool are settled.

"The association may contract with the owners of redrying plants to redry and store tobacco delivered by the members of the association.

"8.   The association may sell the said tobacco, within or without the United States, directly to manufacturers or exporters or otherwise, at such time and in such form and upon such conditions and terms as it may deem profitable, fair and advantageous to the grower; and it may sell all or any part of the tobacco with or through any other agency established for the co-operative marketing of the tobacco of other growers, under such conditions as will serve the joint interest of the growers and the public; and any proportionate expenses connected therewith shall be deemed marketing costs under paragraph 6.

"9.   The grower agrees that the association shall have absolute title to the tobacco upon delivery thereof, and that the association shall borrow money in its name on the tobacco, through drafts, acceptances, notes or otherwise, or on any warehouse receipts or bills of lading or upon any accounts for sale of tobacco or on any commercial paper delivered therefor.   The association shall prorate the money so received among the growers equitably, as it may determine, for each district and period of delivery.

"The association agrees to accept drafts drawn against it by the growers for any amount specified and determined by it, upon delivery of tobacco hereunder, and to assist the grower to discount such drafts, secured by the warehouse receipts through the most advantageous banking system.

. . . . . . .

"11.   The grower shall have the right to stop growing tobacco and to grow anything else at any time at his free discretion; but if he produces any tobacco or acquires or owns any interest in any tobacco, as landlord

or lessor, during the term hereof, it shall all be included under the terms of this agreement and must be sold only to the Association.

. . . . . . .

"13. (a) This agreement shall be binding upon the grower as long as he produces tobacco directly or indirectly, or has the legal right to exercise control of any commercial tobacco or any interest therein as a producer or landlord during the term of this contract.

. . . . . . .

"18. (a) Inasmuch as the remedy at law would be inadequate, and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association should the grower fail so to sell and deliver all of his tobacco, the grower hereby agrees to pay to the association for all tobacco delivered, consigned or marketed or withheld by or for him, other than in accordance with the terms hereof, the sum of five cents per pound as liquidated damages, averaged for all types and grades of tobacco, for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the growers to each and all of the said contracts.

"(b) The grower agrees that in the event of a breach or threatened breach by him of any provisions regarding delivery of tobacco, the association shall be entitled to an injunction to prevent breach or further breach thereof and to a decree for specific performance thereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions, and that the buyer cannot go

into the open markets and buy tobacco to replace any which the grower may fail to deliver.

"(c) If the association brings any action whatsoever by reason of a breach or threatened breach hereof, the grower agrees to pay to the association all costs of court, costs for bond and otherwise, expenses of travel and all expenses arising out of or caused by litigation and any reasonable attorney's fee expended or incurred by it in such proceedings; and all such costs and expenses shall be included in the judgment and shall be entitled to the benefit of any lien securing any judgment hereunder."

The testimony upon which the defendant relies, and which he insists establishes that complainant is an illegal trust or combination, is the following from the cross-examination of the witness, R. E. Cooper:

"Q. Mr. Cooper, the association had this agreement, as I understand, that the association would function if they got sixty-six and two-thirds per cent. of all that acreage of tobacco in the territory in which they intended to operate, that is true, isn't it?

"A. Yes, sir.

"Q. What is the reason they wanted to get the sixty-six and two-thirds per cent?

"A. Have a majority.

"Q. You mean, control the crop?

"A. Yes, sir."

The above was testified to by the witness on cross-examination. On redirect examination of counsel for the complainant association, he was asked and answered as follows:

"Q. Mr. Cooper, I will ask you to state whether or not it was contemplated by the association to ask for to-

bacco an unreasonable price or a price detrimental to the interests of the public?

"A. The purpose and intent was to maintain a fair, uniform price that would be a profit to the grower, a fair profit to the grower.

"Q. And fair also, as I understand it, to the general consumer?

"A. It was stated generally that there would not be accepted exorbitant prices, but ones that would be fair to the purchaser."

On recross-examination the witness testified as follows:

"Q. But the association was organized for the purpose of fixing the price?

"A. Yes, sir.

"Q. And that is why you wanted a majority of members, isn't that so, so you could do it?

"A. Yes."

Restraints upon interstate commerce are covered in the Sherman Act and the Clayton Act (38 Stat. 730).

In section 6 of the Clayton Act (U. S. Comp. St. section 8835f) farmers' co-operative marketing associations are expressly exempted from the operation of the federal anti-trust statutes.

Complainant insists that it comes within the exemption of section 6 of the Clayton Act, which exempts "agricultural or horticultural organizations, instituted for the purposes of mutual help and not having capital stock or conducted for profit." Plaintiff insists that it is an agricultural organization, and that it was organized for the mutual help of its members; that it has no capital stock and is not conducted for profit. It insists, therefore, that it does not come within the anti-trust laws of the United States.

In *United States* v. *Keystone Watch Co.* (D. C.), 218 Fed., 502, are listed the acts which make a combination illegal:

(1) Coercion or suppression of competitors.

(2) Unfair or fraudulent rivalry.

(3) Arbitrarily fixing and maintaining prices.

(4) Limiting production or creating an artificial scarcity.

(5) Impairment of quality.

(6) Decreasing wages and price of materials.

Complainant is not shown to have been guilty of any of these acts. The mere fact that complainant is large and powerful, and may in the future be guilty of some one or more of these acts, does not render it an unlawful combination or trust.

In *United States* v. *United States Steel Corporation,* 251 U. S., 417, 40 Sup. Ct., 293, 64 L. Ed., 343, 8 A. L. R., 1121, it was held that mere size and mere possibility of oppression or other illegal act does not even tend to prove the illegality of a corporation. In that case the court said:

"The corporation is undoubtedly of impressive size and it takes an effort of resolution not to be affected by it or to exaggerate its influence. But we must adhere to the law and the law does not make mere size an offense or the existence of unexerted power an offense. It, we repeat, requires overt acts, and trusts to its prohibition of them and its power to repress or punish them. It does not compel competition nor require all that is possible."

In *Standard Oil Co.* v. *United States,* 221 U. S., 1, 31 Sup. Ct., 502, 55 L. Ed., 619, 34 L. R. A. (N. S.), 834, Ann. Cas., 1912D, 734, *United States* v. *American Tobac-*

*co Co.,* 221 U. S., 106, 31 Sup. Ct., 632, 55 L. Ed., 663. *International Harvester Co.* v. *Kentucky,* 234 U. S., 216, 34 Sup. Ct., 853, 58 L. Ed., 1284, and *Collins* v. *Commonwealth,* 234 U. S., 634, 34 Sup. Ct., 924, 58 L. Ed., 1510, it was held that there must be both allegation and proof of overt acts detrimental to the public before a corporation or combination, no matter how extensive and powerful, can be held to be in restraint of trade, either under the acts of Congress or the common law. In other words, unless facts are shown which establish that complainant has been guilty of one or more acts inimical in interest to the public (such as the acts mentioned in the case of *United States* v. *Keystone Watch Co.,* supra), it cannot be declared an unlawful combination.

Defendant insists that, because the contract provides for the creation of subsidiary warehouse corporations with capital stock, this takes complainant out of the class of a nonprofit association.

In *Tobacco Growers' Co-operative Association* v. *Jones,* 185 N. C., 275, 117 S. E., 179, this very question was passed upon by the supreme court of North Carolina. In that case the court said:

"The enemies of the co-operative system would be delighted if the courts were to hold that a co-operative association is not permitted to use its own money in establishing warehouses, prize houses, redrying and processing plants, and were forced to depend for these facilities upon such terms as the association could make with its competitors. The latter would be in the position of an army well armed meeting in battle another army with no arms at all. The co-operative association is merely granted by the statute the privilege of building or con-

structing the necessary instrumentalities for carrying out the purposes of the association and of using its own money therefor, under terms and conditions specified in the contract and agreed to by all its members. The co-operative marketing system has justified itself."

There are a number of federal cases relied on by defendant to sustain its contention that complainant is an unlawful combination acting in restraint of trade. We need not analyze these cases, as the facts disclosed by the record in the cause under consideration do not bring complainant within the class of combinations there dealt with. The facts in the cases relied on by defendant showed a plan or arrangement to stifle competition and enhance prices to the injury of the public good, and said cases are not, therefore, in point.

Our conclusion, therefore, is that the contract sued on is not violative of the Sherman Anti-Trust Law. Nor do we think it is violative of the Tennessee anti-trust law, which reads as follows:

"Trusts and Combinations are Unlawful and Void.— All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of articles of domestic growth or domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful, and void." Shannon's Code, section 3185.

Dark Tobacco Growers' Co-op. Assn. v. Mason.

Counsel for defendant cite the cases of *Bailey* v. *Master Plumbers,* 103 Tenn., 99, 52 S. W., 853, 46 L. R. A., 561, and *Standard Oil Co.* v. *State,* 117 Tenn., 618, 100 S. W., 705, 10 L. R.. A. (N. S.), 1015, in support of their contention. that complainant is a combination or trust in violation of the above statute. These cases are not in point here. In each of them the facts showed that the defendant was a combination operating under .such a plan or arrangement as tended to impair competition and to enhance prices to the injury of the public, while in the cause under consideration the facts do not establish any such thing on the part of complainant. In fact, the proof shows that the price fixed and maintained by complainant for the tobacco handled by it was lower than the price paid by buyers for tobacco outside of the association.

The constitutionality of the Bingham Act was upheld by the court of appeals of Kentucky quite recently in the case of *Potter* v. *Dark Tobacco Growers' Cooperative Association* (Ky), 257 S. W., 33.

General acts have been recently passed in about thirty States, and upheld so far by the courts of last resort in North Carolina, Oregon, Mississippi, Texas, Kansas, and Wisconsin. *Tobacco Growers' Co-operative Association* v. *Jones,* supra; *Oregon Growers* v. *Lentz,* 107 Or., 561, 212 Pac., 811; *Brown* v. *Staple Cotton Association,* 132 Miss., 859, 96 South., 849; *Texas Farm Bureau Cotton Association* v. *Stovall* (Tex.), 253 S. W., 1101; *Kansas Wheat Growers' Association* v. *Shulte,* 113 Kan., 672, 216 Pac., 311.

It is next insisted that the chancellor erred in not dismissing complainant's suit for the reason that at the

time the contract sued on was entered into complainant was a foreign corporation carrying on business in this State without having complied with its statutes requiring it to file a copy of its charter in the office of secretary of State.

Defendant's contention is that, as the contract was signed by him on October 26, 1922, and was formally accepted by complainant as a corporation on November 25, 1922, and complainant did not file an abstract of its charter with the secretary of State in Tennessee until November 23, 1922, the contract is, for that reason, illegal and cannot be enforced.

The contract is divided into two parts. The first part of the contract is an association agreement. By its terms the various growers signing the same agreed to form complainant association. This portion of the contract became effective and binding as soon as it was signed by the grower.

The second portion, or the marketing agreement, merely tendered a contract to the corporation when organized. The evidence shows that three days before accepting the marketing agreement, and it was found by the jury to be a fact, complainant filed its charter in Tennessee and complied with the law relating to foreign corporations.

With respect to acceptance the contract provides:

"17. The subscriber agrees to be bound by the terms of the following marketing agreement:

" 'For such purpose, signature to this association contract shall be deemed to all effects the same as signature to the said marketing agreement and as acceptance by the board of directors of the association, as of the date of mailing notice thereof to the subscriber, at his address as noted below.' "

Then in subsection (c) of the same section it is provided:

"(c) Acceptance of this application for membership and of the marketing agreement shall be deemed conclusive upon the mailing of the notice by the association; and such mailing and notice shall be conclusively established by the affidavit of the secretary of the association."

The notice of acceptance referred to in the last above quoted paragraph of the contract, as found by the jury, was mailed to defendant on November 28, or 29, 1922, three or four days after complainant had filed its charter in Tennessee, which was on November 25, 1922.

Complainant and defendant having agreed that the contract should be treated as accepted by complainant as of the date of mailing such notice, and the fact of acceptance by the association deemed conclusive upon the mailing of the notice, it must be held that the contract became effective on the date that the notice was mailed to defendant, and not before. Therefore complainant had complied with the Tennessee law relating to foreign corporations when the contract with defendant was made.

It is next insisted that the chancellor error in not holding that the contract sued on was void because in violation of the statute of frauds of both the States of Kentucky and Tennessee.

This contention is based, first, on the fact that complainant did not actually sign the contract Exhibit A; and, second, that the witness Cooper's testimony was necessary to show that other similar contracts had been signed by other growers, and that in the present cause the statute of frauds is a good defense.

In answer to this contention it may be said that it has been repeatedly held by this court that it is not necessary to acceptance that the acceptor sign the identical paper. The contract may be ratified by a separate paper or writing. *Blair* v. *Snodgrass,* 1 Sneed, 1; *Saunders* v. *Hackney,* 10 Lea, 194; *Lee* v. *Cherry,* 85 Tenn., 707, 4 S. W., 835, 4 Am. St. Rep., 800; *Otis* v. *Payne,* 86 Tenn. 663, 8 S. W. 848; *Sheid* v. *Stamps,* 2 Sneed, 173.

The evidence shows that complainant, when it became organized, through its members and also through the board of directors, expressly accepted the contract with defendant. The minutes of the meeting accepting the contract set out the form of the contract, and these minutes are not only signed by the presiding officer and secretary, but by each director. The notice which was mailed to defendant was in writing, and specifically mentioned the agreement signed by defendant, and stated that the association accepted it. This notice was signed by the association by its secretary.

The contract provides that acceptance by the association and the mailing of notice shall be conclusively established by the affidavit of the secretary, which was made and filed as a part of the record in this cause. We are clearly of the opinion, therefore, that the contract is not within the statute of frauds.

It is next insisted that the contract is unilateral and lacks mutuality.

In *Texas Seed Co.* v. *Chicago Co.* (Tex. Civ. App.), 187 S. W., 747, the court said:

"Generally, there is mutuality of obligation where both parties undertake to do something. A contract does not lack mutuality merely because every obligation of

the one party is not met by an equivalent counter obligation of the other.''

''Mutuality of contract means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other.'' *Campbell* v. *American Co.*, 117 Mo. App., 19, 94 S. W., 815.

In *St. Louis Co.* v. *Clark*, 90 Ark., 504, 119 S. W., 825, the rule is announced to the same effect.

To the same effect are our own cases of *Cherry* v. *Smith*, 3 Humph., 19, 39 Am. Dec., 150; *Fourth Nat. Bank* v. *Stahlman*, 132 Tenn., 367, 178 S. W., 942, L. R. A., 1916A, 568; *Farabee-Treadwell Co.* v. *Bank & Trust Co.*, 135 Tenn., 208, 86 S. W., 92, L. R. A., 1916F, 501.

It is invariably held that the promise of one party is a valid consideration for the promise of the other party.

An examination of the contract sued on, shows that the association made a number of binding promises:

(1) It agreed to buy all of the tobacco produced by the defendant for a period of five years. Paragraph 2.

(2) It agreed to make rules and regulations, provide inspectors, graders or classifiers, grade the quality and method and manner of handling, curing and shipping tobacco. Paragraph 4c.

(3) It agreed to pool or mingle the tobacco of the grower with tobacco of like type, grade, and quality delivered by other growers. It agreed to classify the tobacco. Paragraph 5.

(4) It agreed to resell such tobacco at the best prices obtainable by it under marketing conditions. Paragraph 6.

(5) It agreed to pay over to the grower the net amount received therefor less actual expenses without any profit whatsoever. Paragraph 6.

(6)   It agreed to proportion the net proceeds of such tobacco in accordance with the amount of tobacco delivered by each grower to the pool.   Paragraph 6.

These are binding promises.   If complainant fails to pay over to the grower his share of the pool, he has an action for goods sold and delivered.   If the complainant fails to market the tobacco in accordance with its agreement, the grower has a right of action against it.

We are of the opinion, therefore, that the contract is not unilateral.

It is next said that the contract should not be enforced because it is harsh, oppressive, unjust, and inequitable.

There is no merit in this contention, and elaboration is unnecessary.

It is next insisted that complainant committed the first breach of the contract, and therefore cannot maintain the present action against defendant for failure on his part to perform.

This contention is predicated alone on defendant's insistence that complainant was bound by an alleged oral collateral agreement to advance him sixty per cent. of the graded value of his tobacco on delivery, and that it failed and refused to do this.

This was one of the issues submitted to the jury, and the jury found that such collateral agreement was made.

The contract Exhibit A does not provide that the association will pay defendant sixty per cent. of the graded value of his tobacco on delivery.   The contract does provide, however, that there are—"no oral or other conditions, promises, covenants, representations or inducements in addition to or at variance with any of the terms hereof; and that this agreement represents the voluntary

and clear understanding of both parties fully and completely.''

Complainant, by amendment to its bill, specially pleaded the statute of frauds of both Kentucky and Tennessee against this alleged oral collateral agreement.

The only persons mentioned by defendant, as having represented to him that complainant would advance sixty per cent. prior to his signature to contract Exhibit A, were Leslie Taylor and J. L. Hollingsworth, farmers, who are neighbors of defendant, and who, he says, solicited him to join.

Hollingsworth was introduced by defendant as a witness, but was not asked about the sixty per cent. advance.

Taylor testified that he did not state to defendant or any other person that the association, when organized, would advance sixty per cent. on delivery of tobacco.

A number of witnesses were called by defendant to prove that in speeches made in Robertson county by a number of gentlemen, prior to the organization of complainant, it was represented that complainant, when organized, would advance sixty per cent. A number of witnesses claimed to have heard Judge Bingham when he spoke in Springfield, and in his Springfield speech he made such representation. He only spoke in Springfield one time, and the stenographic report of his speech, which was afterwards printed in a newspaper, was identified by the stenographer who took it, and nowhere in this speech was any such representation made.

But, aside from all this, evidence as to said parol collateral agreement was clearly incompetent and inadmissible, and the chancellor so instructed the jury. At the time it is claimed these representations were made, com-

plainant had not become a corporation; but, if it had, and such representation had been made by some person authorized by the corporation to make it, it clearly would have fallen within the statute of frauds and would not have been binding on complainant.

It is next insisted that the chancellor erred in the admission of certain testimony given by the witness R. E. Cooper, over defendant's objection, by which it was sought to prove that the contract sued on was similar to contracts signed by other tobacco growers.

It is also insisted that the chancellor erred in excluding certain testimony of the witness Neely Adams, offered in behalf of defendant, with reference to representations made to some of the farmers by those soliciting contracts similar to contract Exhibit A, that complainant would advance them sixty per cent. on their tobacco.

We think there is no reversible error in the admission of the evidence of the witness Cooper. Nor do we think there was any error in the exclusion of the evidence offered by the witness Adams in defendant's behalf. This evidence was clearly incompetent, and its exclusion was not error.

It results that we find no error in the decree of the chancellor, and it is affirmed with costs, and the cause is remanded to the court below for further proceedings upon the order of reference.