## DARK TOBACCO GROWERS' CO-OPERATIVE ASSOCIATION *v.* ROBERTSON.

[No. 12,214. Filed January 6, 1926.]

1. PLEADING.—A demurrer admits the truth of the allegations in the pleading to which it is addressed. p. 60.

2. CORPORATIONS.—*Statute requiring registration of foreign corporations before doing business in this state not applicable to interstate commerce.*—The statute requiring the registration of foreign corporations before doing business in this state (§4909 *et seq.* Burns 1926, §4085 *et seq.* Burns 1914) does not affect the right of a foreign corporation to enter into contracts in this state relating to interstate commerce and to maintain actions for the breach thereof. p. 61.

3. CORPORATIONS.—*Inapplicability of foreign corporation registration statute not available in specific case.*—A foreign corporation organized under a statute authorizing it- to do several different kinds of business, some of which could not be interstate commerce, which had sued to enforce a contract made in this state but which did not allege that it was doing business in states other than Indiana, or that its contracts made in this state had reference to the shipment of articles of commerce to another, state, could not successfully contend on appeal that the statute requiring the registration of foreign corporations did not apply to it because it was engaged in interstate commerce. p. 61.

4. CORPORATIONS.—*State may prescribe conditions on which foreign corporations may do business therein.*—So long as a state violates no constitutional restriction, it may prescribe the conditions on which foreign corporations may transact business within its borders. p. 63.

5. CORPORATIONS.—*Statutes declare the public policy that foreign corporation shall not, do business in this state which domestic corporation not authorized to do.*—The provisions of the statutes regulating the admission of foreign corporations to this state (§4909 *et seq.* Burns 1926 and §4925 *et seq.* Burns 1926) declare it to be the public policy of this state not to permit any foreign corporation to do or transact any business in Indiana for the transaction of which a corporation could not be organized· under the laws of this state. p. 64.

6. CORPORATIONS.—*Foreign corporation may be admitted to this state with authority to engage in co-operative marketing.* Under the provisions of §5283 Burns 1926, §4359b Burns 1914, a corporation may be organized "for the co-operative transac-

Dark Tobacco Growers', etc., Assn. *v.* Robertson—84 Ind. App. 51.

tion of any lawful business," which necessarily includes the co-operative marketing of crops and other products, and hence a foreign corporation may be authorized to do such business in this state. p. 68.

7. CORPORATIONS.—*Word "corporation" in act prohibiting foreign nonprofit corporations from doing business which domestic corporation could not do means any kind of domestic corporation whether organized for profit or not.*—The word "corporation" in the latter part of §4927 Burns 1926 (Acts 1921 p. 117, §3) providing that no foreign nonprofit corporation admitted to this state shall be authorized to transact any business for which a corporation could not be organized under the laws of this state means any domestic corporation, whether organized on a profit or nonprofit basis. p. 69.

8. AGRICULTURE.—A co-operative marketing contract between a tobacco grower and a co-operative association of growers is not without consideration nor wanting in mutuality. p. 69.

9. DAMAGES.—*Provision for liquidated damages for breach of co-operative marketing contract held valid.*—A provision in a co-operative marketing contract for liquidated damages for any breach thereof by a grower or producer held valid. p. 70.

10. MONOPOLIES.—*Tobacco growers' co-operative association held not monopoly or trust in restraint of trade, contrary to public policy nor anti-trust laws.*—A tobacco growers' co-operative association organized under a statute similar to Acts 1925 p. 42, §3662 *et seq.* Burns 1926, held not a monopoly or trust in restraint of trade nor against public policy nor contravening anti-trust laws. p. 72.

11. MONOPOLIES.—*Size of corporation, in itself, does not tend to establish illegality thereof as a monopoly or trust in restraint of trade.*—The mere size of a corporation, thereby creating the possibility of oppression or other illegal act, does not tend to establish illegality thereof as a monopoly or trust in restraint of trade. p. 76.

From Warrick Circuit Court; *Caleb J. Lindsey,* Judge.

Action by the Dark Tobacco Growers' Association against Baxter T. Robertson. From a judgment for defendant, the plaintiff appeals. *Reversed.* By the court in banc.

*Elbert M. Swan* and *Roy G. Garrison,* for appellant.
*Roscoe Kiper,* for appellee.

McMAHAN, J.—Complaint by appellant against appellee, one of its members, for the recovery of liquidated damages for breach of a marketing agreement signed by appellee. A demurrer to the complaint was sustained; hence this appeal.

The complaint alleges: That appellant is a nonprofit corporation without capital stock, organized November 20, 1922, under the provisions of the act of the General Assembly of the State of Kentucky approved January 10, 1922, and known as, "The Bingham Cooperative Marketing Act." That in February, 1923, it filed a certified copy of its articles of incorporation in the office of the secretary of state of Indiana and made application for authority to do business in this state in accordance with the provisions of, "An act to regulate the admission of foreign corporations not for profit to do business in the State of Indiana," approved March 1, 1921, and that the secretary of state granted and issued to it license and authority to do, transact, and engage in business in this state in accordance with the objects and purposes of its articles of incorporation, and that it has been "doing business" in this state since that time. That appellee became and was a member of appellant corporation by virtue of his agreement and the acceptance thereof by appellant. That appellee by this written agreement, a copy of which is made a part of the complaint, sold to appellant all tobacco raised by him in 1923, and certain other years, and agreed to deliver the same to appellant. That said contract was signed by appellee in this state and thereafter submitted to and accepted by appellant in the State of Kentucky, and by its terms was subject to interpretation and enforcement according to the laws of Kentucky, the consideration of said agreement being the mutual promises of the parties thereto as set out in such agreement. That appellee raised 5,000 pounds of tobacco in

1923, but failed to deliver the same or any part thereof to appellant, but had sold and delivered the same to other parties in violation of his said agreement.

A copy of "The Bingham Co-operative Market Act" of Kentucky was copied in and made a part of the complaint. This act authorized the incorporation of a non-profit co-operative association with or without capital stock "to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping, or utilization thereof, or the manufacturing or marketing of the by-products thereof; or in connection with the manufacturing, selling, or supplying to its members of machinery, equipment or supplies; or in the financing of the above activities; or any one or more of the activities specified herein."

An association organized under that act was given the power to engage: (a) In any of the activities above named; (b) to borrow money without limitation as to the amount and make advances to members; (c) to act as agent for any member in any of said activities; (d) to acquire, hold, sell, pledge, or guarantee payment of dividends or interest on, or the retirement of shares of capital stock or bonds of any corporation engaged in any related activity, or in the warehousing, handling or marketing of any product handled by the association; (e) to establish reserves and invest same; (f) to buy and hold personal and real property necessary for conducting the business of the association; and (g) to do each and everything necessary, suitable, or proper to accomplish any one of the purposes or attainments named, or expedient for the interest of the association and to contract accordingly.

Section 17 of the act authorized the association and its members to make and execute marketing contracts

NOVEMBER TERM, 1925.     55

Dark Tobacco Growers', etc., Assn. v. Robertson—84 Ind. App. 51.

requiring the members to sell, for any period of time, not to exceed ten years, all or any part of their agricultural products and that such contract should pass title of the products to the association. Section 18 provided that the by-laws or marketing contract might fix as liquidated damages specific sums to be paid by the member to the association upon a breach by him of his marketing contract.

The material provisions of the marketing agreement which is the foundation of this action read as follows:

"1.   The grower is a member of the association and is helping to carry out the express aims of the association for co-operative marketing, for minimizing speculation and waste and stabilizing tobacco markets in the interest of the grower and the public, through this and and similar obligations undertaken by other growers.

"2.   The association agrees to buy and the grower agrees to sell and deliver to the association all of the tobacco produced by him or for him or acquired by him as landlord or lessor, during the years 1923, 1924, 1925, and 1926.   *   *   *

"4.   (a) All tobacco shall be delivered at the earliest reasonable time after cutting or curing, drying, or firing when customary, to the order of the association, at the warehouse or plant controlled or specified by the association; or at the nearest warehouse, if the association controls or specifies no warehouse or plant in that immediate district; or by shipment, as directed, to the association; and by delivery to the association of the indorsed warehouse or other receipts or bills of lading, properly directed.   (b) Any deduction or allowance or loss that the association may make or suffer on account of inferior grade, quality or condition at delivery shall be charged against the grower individually.   (c) The association shall make rules and regulations and provide inspectors or graders to stand-

ardize and grade the quality and method and manner of handling, curing and shipping such tobacco; and the grower agrees to observe any such rules and regulations and to adopt the grading established by the state and federal authorities and the association.

"5. The association shall pool or mingle the tobacco of the grower with the tobacco of a like type, grade and quality delivered in the same crop year by other growers. The association shall classify the tobacco and its classification shall be conclusive. The tobacco delivered in any crop year to any point at the order of the association shall be handled in one major pool; and the minor pools shall first be by type and then by grade and quality within each type.

"6. The association agrees to resell such tobacco, together with tobacco of like type, grade and quality delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions; and to pay over the net amount received therefrom (less the freight, insurance and interest), as payment in full to the grower and growers named in contracts, similar hereto, according to the tobacco delivered by each of them after deducting therefrom, within the discretion of the association, the costs of maintaining the association and of handling, grading and marketing such tobacco; and of creating funds for credits and other general commercial purposes (said funds not to exceed one per cent. of the gross resale price). The annual surplus from such deductions must be prorated among the growers delivering tobacco in that year on the basis of deliveries.

"7. The grower agrees that the association may handle, in its discretion, some of the tobacco in one way and some in another; may sell some upon delivery, may cure or process or manufacture all or any portion thereof, but the net proceeds of all tobacco, or tobacco prod-

ucts of like type, quality and grade, less charges, costs and advances, shall be divided ratably among the growers in proportion to their deliveries to each pool, payments to be made from time to time until all the accounts of each pool are settled. The association may contract with the owners of redrying plants and to redry and store tobacco delivered by the members of the association.

"8. The association may sell the said tobacco, within or without the United States, directly to manufacturers or exporters or otherwise, at such time and in such form and upon such conditions and terms as it may deem profitable, fair and advantageous to the grower; and it may sell all or any part of the tobacco with or through any other agency established for the co-operative marketing of the tobacco of other growers, under such conditions as will serve the joint interest of the growers and the public; and any proportionate expenses connected therewith shall be deemed marketing costs under paragraph six.

"9. The grower agrees that the association shall have absolute title to the tobacco upon delivery thereof, and that the association shall borrow money in its name on the tobacco, through drafts, acceptances, notes or otherwise, or on any warehouse receipts or bills of lading or upon any accounts for the sale of tobacco or on any commercial paper delivered therefor. The association shall prorate the money so received among the growers equitably, as it may determine, for each district and period of delivery. The association agrees to accept drafts, drawn against it by the growers for any amount specified and determined by it upon delivery of tobacco hereunder; and to assist the grower to discount such drafts, secured by the warehouse receipts, through the most advantageous banking system.
\* \* \*

"11. The grower shall have the right to stop growing tobacco and to grow anything else at any time at his free discretion, but if he produces any tobacco or acquires or owns any interest in any tobacco as landlord or lessor, during the term thereof, it shall be included under the terms of this agreement and must be sold only to the association. * * *

"13. (a) This agreement shall be binding upon the grower, as long as he produces tobacco directly or indirectly, or has the legal right to exercise control of any commercial tobacco or any interests therein as a producer or landlord during the terms of this contract. * * *

"15. This agreement is one of a series generally similar in terms comprising with all such agreements, signed by individual growers, or otherwise, one single contract between the association and the said growers collectively and individually under all of the terms thereof. The association shall be deemed to be acting in its own name for all such growers in any action or legal proceedings on or arising out of this contract.

"16. (a) The grower hereby expressly authorizes the association to deliver to any warehousing or other corporation organized for co-operating with this association any or all of his tobacco for handling, processing, or manufacturing, or storing, and to charge against his tobacco and his prorated share of the funds necessary to create a reserve, equivalent to one class of its preferred stock annually to retire the said class; and to pay the dividends on all outstanding stock thereof. * * *

"18. (a) Inasmuch as the remedy at law would be inadequate; and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association should the grower fail so to sell and deliver all of his tobacco,

the grower hereby agrees to pay to the association for all tobacco delivered, consigned or marketed or withheld by or for him, other than in accordance with the terms hereof, the sum of five cents per pound as liquidated damages, averaged for all types and grades of tobacco, for the breach of this contract; all parties agreeing that this contract is one of a series, dependent for its true value upon the adherence of each and all of the growers to each and all of the said contracts. (b) The grower agrees that in the event of a breach or threatened breach by him of any provisions, regarding delivery of tobacco, the association shall be entitled to an injunction to prevent breach or further breach thereof and to a decree for specific performance thereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions; and that the buyer cannot go into the open market and buy tobacco to replace any which the grower may fail to deliver. (c) If the association brings any action whatsoever by reason of a breach or threatened breach hereof, the grower agrees to pay to the association all costs of courts, costs for bond and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fees expended or incurred by it in such proceedings; and all such costs and expenses shall be included in the judgment and shall be entitled to the benefit of any lien securing any judgment hereunder.

"19. The parties agree that there are no oral or other conditions, promises, covenants, representations or inducements in addition to or at variance with any of the terms hereof; and that this agreement represents the voluntary and clear understanding of both parties fully and completely. * * * Read, considered, and signed by the grower, as of the date deter-

mined by the association contract and as in the State of Kentucky and subject to interpretation and enforcement according to the laws of Kentucky."

The complaint alleges, and appellee by his demurrer admits that appellant is a nonprofit co-operative association, without capital stock, organized under the laws of Kentucky, that it applied to the secretary of state for authority to transact business in this state, that it received such authority from the secretary of state, and that it is doing business in Indiana; that the contract sued on was signed by appellee in this state and was accepted by appellant in Kentucky, and that by its terms it is subject to interpretation and enforcement according to the laws of Kentucky and that all of the provisions and terms of such contract are valid and enforceable under the laws of that state.

With these allegations admitted to be true, it would seem that this cause might well be reversed without any extended discussion, were it not for appellee's contention that appellant has no right or authority to sue on and enforce such contract in the courts of this state. Appellant bases its right to use the courts of this state in enforcing the contract in question on the ground that as a nonprofit, nonstock corporation organized under the laws of another state, it filed its charter with the secretary of state of Indiana and received from him a certificate authorizing it to do business in this state.

Appellant contends:    (1) That having complied with the statute of this state controlling the admission of foreign corporations to do business in this state, it has the right to maintain an action in the courts of this state to enforce contracts made in the transaction of its business in this state; and (2) that the statute requiring the registration of a foreign corporation before doing business in this state is not applicable to the

facts pleaded for the reason that the contract sued on and appellant's business constitute interstate commerce.

If the business in which appellant was engaged in this state was interstate commerce and the contract related to interstate commerce appellant's second 2, 3. contention would have to be sustained. It is to be observed, however, that neither appellant's articles of incorporation nor the certificate of the secretary of state authorizing appellant to do business in this state is made a part of the complaint and we are not advised as to the particular purpose for which appellant was incorporated. The law under which it was incorporated provided that it might be incorporated to engage in any one or more of the activities named. We do not know whether it was organized for the purpose of marketing or selling the agricultural products of its members, or for harvesting, preserving, or shipping the same, or for manufacturing or marketing the by-products thereof, or for manufacturing and selling to its members machinery or supplies or for the purpose of financing any of the above activities. It could have been incorporated for any one or all of the purposes named, and, when so incorporated, it was given power to enter into the contract sued on. There is no allegation in the complaint that appellant was doing business in Kentucky or any state other than Indiana. There is no allegation that the tobacco purchased from appellee was purchased for the purpose of shipping to a foreign state. For all that appears appellant was doing business in Indiana only and purchased appellee's tobacco and entered into the contract with the intention to use the tobacco so purchased in this state and not elsewhere.

The complaint is not drafted on the theory that the business in which appellant was engaged in this state was interstate commerce. The fact that it applied to the secretary of state for a license to transact business

62    APPELLATE COURT OF INDIANA,

Dark Tobacco Growers', etc., Assn. *v.* Robertson—84 Ind. App. 51.

in this state would seem to be an admission that it was engaged in intrastate commerce and that it was necessary for it to have a license to carry on its business in this state. If the contract entered into had been a part of a transaction connected with interstate commerce such license would not have been necessary. *Lemke* v. *Farmers Grain Co.* (1921), 258 U. S. 50, 42 Sup. Ct. 244, 66 L. Ed. 458; *Crutcher* v. *Commonwealth* (1890), 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649; *Dahnke-Walker Milling Co.* v. *Bondurant* (1921), 257 U. S. 282, 42 Sup. Ct. 106, 66 L. Ed. 239. In passing on this question, we are not unmindful of the holding of the Supreme Court of the United States in *Shafer* v. *Farmers Grain Co.* (1925), 268 U. S. 189, 45 Sup. Ct. 481, 69 L. Ed. 909, where it was held that buying grain within a state for shipment to markets in other states constituted interstate commerce if followed by shipment into other states. Nor have we overlooked *Nebraska Wheat Growers Assn.* v. *Norquest* (1925), 204 N. W. (Nebr.) 798, where, under an agreed statement of facts, the court held that a corporation organized for the purpose of, and doing business as appellant apparently was doing, was engaged in interstate commerce, and was not required to file the certificate of its incorporation before doing business in that state, and that a statute requiring a foreign corporation to file a copy of its articles of incorporation did not apply to a corporation doing interstate commerce. The facts are not very fully set out in the opinion, and it may be that it clearly appeared from the agreed statement of facts that the association in that case was buying its members' wheat for the purpose of shipping it out of the state. The opinion does not state the line of reasoning used by the court in reaching the conclusion that the business there involved related to interstate commerce. Since the court cited *Shafer* v. *Farmers Grain Co., supra,* in

support of its holding, it may have acted upon the theory that it took judicial notice of the method of marketing wheat in that state, but we are not prepared at this time to hold that we know appellant was purchasing appellee's tobacco for the purpose of shipping into another state. There is no allegation in the complaint justifying the inference that the contract sued on grew out of and was a part of a transaction connected with interstate commerce. This contention of appellant, therefore, cannot prevail.

Can appellant's first contention prevail? The complaint alleges that having filed application for leave to do business in this state, the secretary of state, duly made, granted, and issued license and authority to it permitting and authorizing it to do, transact, and engage in business in this state "in accordance with the objects and purposes" named in its articles of incorporation. A state has the undoubted right so long as it violates no constitutional provision to prescribe the conditions upon which a foreign corporation may transact business within its borders. In addition to some special statutes relating to railroads, insurance companies, etc., there are now in force two general statutes prescribing the terms upon which foreign corporations can do business in this state.

Section 4909 Burns 1926, §4085 Burns 1914, Acts 1907 p. 286, relates to corporations organized for profit and reads as follows: "That before any foreign corporation for profit shall be permitted or allowed to transact business or exercise any of its corporate powers in the State of Indiana, other than insurance companies, building and loan companies, and surety companies, they shall be required to comply with the provisions of this act and shall be subject to all the regulations, limitations and restrictions applying to corporations of like character organized under the laws

**64    APPELLATE COURT OF INDIANA,**

Dark Tobacco Growers', etc., Assn. *v.* Robertson—84 Ind. App. 51.

of this state." Under §9 of the same act, §4918 Burns 1926, §4094 Burns 1914, a corporation failing to comply with any of the provisions of the act was liable to a fine and was denied the right to maintain any action in any court in this state. The provisions of the above sections were limited to foreign corporations doing business for profit.

In 1921, Acts 1921 p. 117, the legislature passed an act regulating the admission of foreign corporations not for profit to do business in this state. Sections 1 and 3 of this act, (§§4925, 4927 Burns 1926, §§4098a, 4098c Burns' Supp. 1921), read as follows: 1. "Before any foreign corporation without capital stock and not for pecuniary profit shall be permitted or allowed to transact business or exercise any of its corporate powers in the State of Indiana, it shall be required to file in the office of the secretary of state a copy of its charter or articles of incorporation duly certified and authenticated by the officer who issued the original, or the officer with whom the original was filed or recorded." 3. "The secretary of state, upon the admission of such foreign corporation to do business in the State of Indiana, shall issue a certificate and shall state in such certificate of authority to do business issued by him, the powers and objects of said corporation which may be exercised in this state, and no corporation shall by this certificate of the secretary of state by (be) authorized to transact any business in this state for the transaction of which a corporation cannot be organized under the laws of Indiana."

This last section is an exact copy of §4 of the act of 1907, §4088 Burns 1914, §4912 Burns 1926, and they clearly indicate a legislative intent that no foreign corporation affected by either of said acts shall be permitted to do or transact any business in this state for the transaction of which a corporation could

not be organized under the laws of this state. The public policy of the state has thus been declared.

Appellant recognizes the force and effect of these statutes and contends: (1) That a corporation can be organized under the laws of this state to transact the business which was involved in the execution of the contract which is the foundation of this action; (2) that the certificate of the secretary of state is not subject to collateral attack by appellee; (3) that the contract, being a Kentucky contract, is not included within the terms of §4098c, *supra;* (4) that the transaction is interstate commerce and the statute is not applicable; and (5) that the failure of a foreign corporation to comply with the statute must be raised by a plea in abatement.

We have heretofore discussed the proposition that the transaction related to interstate commerce, and held against this contention of appellant. In so far as the fifth contention is concerned, it is sufficient to say that there is no contention that appellant failed to comply with the statute authorizing a foreign corporation to apply for leave to do business in this state. Appellee's contention is that no corporation could have been organized in this state to transact the business which appellant did in this state, and that the certificate of the secretary of state did not, as a matter of law, authorize appellant to enter into the contract with appellee. This contention of appellee is based upon the theory that no corporation could have been organized in this state to transact that kind of business, and consequently the certificate of the secretary of state issued to appellant did not authorize it to enter into the contract. This brings us to a consideration of appellant's contention that a corporation could have been organized under the laws of this state to transact the business connected

with the execution of the contract in question. Chapter 164, Acts 1913 p. 431, §§4359a-4359c Burns 1914, §§5282-5288 Burns 1926, is an act entitled, "An act concerning co-operative corporations or associations." Section 2 of this act (§4359b Burns 1914, §5283 Burns 1926), is as follows: "Any number of persons not less than twenty-five (25) may be associated and incorporated for the co-operative transaction of any lawful business, in accordance with the provisions of the voluntary corporation statutes of this state."

In determining whether appellant's first contention shall prevail, the vital question is whether in February, 1923, when appellant made application to the secretary of state to transact business in this state and when the secretary of state gave it a certificate authorizing it to transact business in this state, a corporation could have been organized in this state to transact the business which appellant apparently was transacting in this state and in connection with which appellee signed the contract mentioned in the complaint.

A reading of §§4088 and 4098c, *supra*, would seem to disclose that it was the intention of the legislature that a foreign corporation doing business either on a profit or nonprofit basis might be admitted to transact business in this state, if a corporation could have been organized in this state to transact the same business. Clearly §4359b, *supra*, authorized the incorporation of an association "for the co-operative transaction of any lawful business."

*In re Co-operative Law Co.* (1910), 198 N. Y. 479, 92 N. E. 15, 32 L. R. A. (N. S.) 55, 139 Am. St. 839, 19 Ann. Cas. 879, involved the construction of a statute which provided that, "Three or more persons may become a stock corporation for any lawful business," and whether a corporation could be organized for the purpose of practicing law. In that connection, the

NOVEMBER TERM, 1925. 67

Dark Tobacco Growers', etc., Assn. v. Robertson—84 Ind. App. 51.

court said: "This means a business lawful to all who
wish to engage in it. The practice of law is not a busi-
ness open to all, but a personal right, limited to a few
persons of good moral character, with special qualifica-
tions ascertained and certified after a long course of
study, both general and professional, and a thorough
examination by a state board appointed for that pur-
pose. The right to practice law is in the nature of a
franchise from the state conferred only for merit. It
cannot be assigned or inherited but must be earned by
hard study and good conduct. It is attested by a cer-
tificate of the Supreme Court and is protected by reg-
istration. No one can practice law unless he has
taken an oath of office and has become an officer of the
court, subject to its discipline, liable to punishment for
contempt in violating his duties as such, and to suspen-
sion or removal. It is not a lawful business except for
members of the bar who have complied with all the con-
ditions required by statute and rules of the court. As
these conditions cannot be performed by a corporation,
it follows that the practice of law is not a lawful busi-
ness for a corporation to engage in. * * * The
legislature in authorizing the formation of corporations
to carry on 'any lawful business' did not intend to in-
clude the work of the learned professions. Such an
innovation with the evil results that might follow would
require the use of specific language clearly indicating
the intention. Recent legislation simply emphasizes
and protects the established policy of the state and al-
though *ex post facto*, tends to show that no such object
was in contemplation when the general term 'lawful
business' was used in the statute to authorize the for-
mation of business corporations. (Laws 1909, chs. 483,
484.) Business in its ordinary sense was aimed at, not
the business or calling of members of the great pro-
fessions, which for time out of mind have been given

exclusive rights and subjected to peculiar responsibilities."

Can we say as a matter of law that the business which appellant transacted in this state and in connection with which the marketing contract was signed by appellee was unlawful? As heretofore noted, neither appellant's articles of incorporation nor the certificate of the secretary of state authorizing it to transact business in this state was made a part of the complaint. It was lawful at that time for tobacco growers by their separate and individual contracts collectively to enter into mutual contracts with a corporation, appointing such corporation their agent "for the purpose of receiving, commingling, warehousing, inspecting, insuring, grading, financing, and selling" their tobacco in such manner and on such terms as the corporation agent might prescribe under its charter. A transaction of that character involving a contract containing the essential features of the one involved in the instant case, was held lawful in *Burley Tobacco Society* v. *Gillaspy* (1912), 51 Ind. App. 583, 100 N. E. 89. If a number of tobacco growers could enter into such a contract appointing another as their agent for the purposes indicated, we see no legal reason why they could not, if they so desired, enter into an association among themselves to do that which they had the power to authorize an agent to do. Such a business transaction would certainly be lawful, and being lawful, §4359b, *supra,* authorized the organization of corporations to transact that character of business. And we hold that a corporation could have been organized in this state with power to do and transact all the business appellant is alleged to have transacted in this state.

Appellee insists that since §4098c, *supra,* is a part of an act regulating the admission of foreign corpora-

tions organized not for profit, the provision
7. therein providing that corporations admitted
under that act shall not be authorized to trans-
act any business in this state for which a corporation
could not be organized under the laws of this state, the
word corporation as used in the latter part of the sec-
tion must be construed as meaning a nonprofit corpora-
tion. He would have us read into the statute the word
"nonprofit," so that it would read "no corporation shall
by this certificate of the secretary of state be author-
ized to transact any business in this state for the trans-
action of which a nonprofit corporation cannot be
organized under the laws of Indiana." This we cannot
do. We hold that the word "corporation" as used in
the latter part of the section means a corporation or-
ganized either on a profit or nonprofit basis.

As heretofore stated the law of Kentucky under
which appellant was incorporated is made a part of the
complaint. It is also alleged that appellant was
8. incorporated under and by virtue of the author-
ity of that law. That the contract by its express
terms is to be interpreted and enforced according to
the laws of Kentucky and that all of the provisions of
the contract are valid and enforceable under the laws
of that state. Appellee makes no claim that appellant
was not under the laws of Kentucky authorized to enter
into the contract. Neither does he contend that under
the laws of that state the contract is not in all of its
parts valid and enforceable. He does contend, how-
ever, that the contract was executed without considera-
tion, and that it is wanting in mutuality. Both this
court and the Court of Appeals of Kentucky have de-
cided these contentions against appellee. See *Burley
Tobacco Society* v. *Gillaspy, supra,* and *Potter* v. *Dark
Tobacco Growers' Assn.* (1923), 201 Ky. 441, 257 S.
W. 33.

On the question as to the sufficiency of the consideration see *Castorland, etc., Co.* v. *Shantz* (1919), 179 N. Y. Supp. 131; *Hollingsworth* v. *Texas Hay Assn.* (1923), 246 S. W. (Tex. Civ. App.) 1068; *Tobacco Growers' Assn.* v. *Jones* (1923), 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; *Texas Farm Bureau Cotton Assn.* v. *Stovall* (1923), 113 Texas 273, 253 S. W. 1101; *Dark Tobacco Growers' Assn.* v. *Mason* (1923), 150 Tenn. 228, 263 S. W. 60.

Co-operative marketing of farm products appears to be a necessity. Its success, however, depends on the business sagacity and honesty of those in charge.

9. It has been enacted into law by the Congress of the United States (§§8716½, 8716½a, U. S. Comp. St. Ann. Supp. 1923), and by the legislatures of at least two-thirds of the states, including Indiana. And it is to be noted that the validity of these acts has been sustained by every court passing on them. Such statutes have been held constitutional, and the standard marketing contracts made by associations organized under them with their members have been held valid and enforceable in the following cases: *Northern Wisconsin, etc., Pool* v. *Bekkedal* (1923), 182 Wis. 571, 197 N. W. 936; *Potter* v. *Dark Tobacco Growers' Assn., supra; Tobacco Growers' Assn.* v. *Jones, supra; Brown* v. *Staple Cotton Assn.* (1923), 132 Miss. 859, 96 So. 849; *Texas Farm Bureau Cotton Assn.* v. *Stovall, supra; Kansas Wheat Growers Co-op. Assn.* v. *Schulte* (1923), 113 Kans. 672, 216 Pac. 311; *Oregon Growers, etc., Assn.* v. *Lentz* (1923), 107 Ore. 561, 212 Pac. 811; *Washington Cranberry Growers Assn.* v. *Moore* (1921), 117 Wash. 430, 201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077; *Anaheim Citrus Fruit Assn.* v. *Yeoman* (1921), 51 Cal. App. 759, 197 Pac. 959; *Ex parte Baldwin County Producers Corp.* (1919), 203

Ala. 345, 83 So. 69; *Castorland, etc., Co.* v. *Shantz, supra; Tobacco Assn.* v. *Patterson* (1924), 187 N. C. 252, 121 S. E. 631; *Dark Tobacco Growers Assn.* v. *Mason, supra; Dark Tobacco Growers Assn.* v. *Dunn* (1924), 150 Tenn. 614, 266 S. W. 308; *Phez* v. *Salem Fruit Union* (1921), 103 Ore. 514, 201 Pac. 222, 205 Pac. 970, 25 A. L. R. 1090; *Minnesota, etc., Assn.* v. *Huggins* (1925), 162 Minn. 471, 203 N. W. 420; *Poultry Producers, etc., Assn.* v. *Barlow* (1922), 189 Cal. 278, 208 Pac. 93; *Hollinsworth* v. *Texas Hay Assn., supra; Nebraska Wheat Growers Assn.* v. *Norquest, supra; Rifle Potato Growers Co-op. Assn.* v. *Smith* (1925), 240 Pac. (Colo.) 937. For a further collection and review of cases involving marketing contracts see note 33 A. L. R. 247. For other cases holding similar contracts valid see *Poultry Producers, etc., Inc.* v. *Nilsson* (1925), 239 Pac. (Cal.) 1086; *Main* v. *Texas Farm, etc., Assn.* (1925), 271 S. W. (Texas) 178; *Redford & Garrison* v. *Burley, etc., Assn.* (1924), 205 Ky. 515, 266 S. W. 24; *Long* v. *Texas Farm, etc., Assn.* (1925), 270 S. W. (Texas) 561. Of the cases holding contracts similar to the one now under consideration not unilateral, but bilateral and mutual in their obligations and enforceable, we cite the following: *Rifle Potato Growers Co-operative Assn.* v. *Smith, supra; Dark Tobacco Growers Assn.* v. *Mason, supra; Hollingsworth* v. *Texas Hay Assn., supra; Texas Farm Bureau Cotton Assn.* v. *Stovall, supra; Potter* v. *Dark Tobacco Growers Assn., supra.* There is no merit in the contention that the provision in the contract for liquidated damages is a penalty and not enforceable.

In *Feagain* v. *Dark Tobacco Growers Co-operative Assn.* (1924), 202 Ky. 801, 261 S. W. 607, where a tenant, when leasing land, knew his landlord was a member of a co-operative marketing association, it was held that the tenant, as well as the landlord was bound to

sell his tobacco to the association; that §18 of the statute of the marketing act of that state created a conclusive presumption that the landlord was able to control the delivery of the whole crop, and that an injunction would lie against the tenant as well as the landlord to prevent the sale of the tenant's share to anyone other than the association. But, in the absence of such a statutory provision, it has been held that a member of such association is not liable to the association for damages because of the failure of his tenant to deliver the tenant's share of the crop to the association. *Tobacco Growers Co-operative Assn.* v. *Bissett* (1924), 187 N. C. 180, 121 S. E. 446.

The contention that appellant is a monopoly or trust in restraint of trade and in violation of the anti-trust laws of the state and nation is entitled to more 10. than a passing notice. In *Nebraska Wheat Growers Assn.* v. *Norquest, supra,* in addition to holding that the association was doing interstate business and not required to file the necessary certificate to authorize a foreign corporation to transact business in the state, the court held that the provision concerning liquidated damages did not afford an adequate remedy at law and that the defendants should be restrained from selling their wheat in violation of the agreement, and that a nonprofit co-operative association like appellant, which had for its purpose the orderly marketing of the wheat of its members, and which did not control prices, restrain trade, or prevent competition did not constitute an unlawful combination.

In discussing the last proposition, the court said: "However, as we view the contract in question, its purpose is not to retard, but to stimulate trade, by intelligent and efficient management by the few in close touch with the demand for wheat, considered in connection

with the mode and distance of its transportation, and its impelling enticement to buyers by reason of the quantity controlled by those in charge. It is organized for mutual help, is without capital stock, is not conducted for profit, but is a simple, business-like scheme of those engaged in wheat growing to advantageously handle and market their product, and this without encroachment upon the rights of others. That it is without the evil aimed at by anti-trust laws is proved by its being open to all, its profits, if any, divided without preference, and there being nothing within its scope or procedure which tends to control prices, restrain trade, or prevent competition. Thus, we conclude that this contract does not contravene either of the above-mentioned statutes or the common law. In this conclusion we are sustained by the following cases deciding similar questions both as to law and fact."

It is to be remembered that restraints upon interstate commerce are covered by the Sherman Act and the Clayton Act, (38 Stat. at L. 730). Section 6 of the Clayton Act (§8835f U. S. Comp. St. 1918) exempts "agricultural or horticultural organizations, instituted for the purpose of mutual help and not having capital stock or conducted for profit" from the operation of the federal anti-trust laws. The Supreme Court of North Carolina in *Tobacco Growers Assn.* v. *Jones, supra,* in speaking of a statute similar to the Bingham Co-operative Marketing Act, and of an association organized under that act said: "An examination of this statute shows, we think, that this association is authorized for the purpose, not of creating a monopoly, but to protect the tobacco producers against oppression by a combination of those who buy, and not to authorize and does not empower, those who produce the raw material to create a monopoly in themselves. Indeed, it seems to us plain that the plaintiff, under the provisions

of its charter, is not and never can become a monopoly for many reasons: (1) As a corporation of North Carolina, the moment it should become dangerous to the public, if that were possible under the terms of its charter, the General Assembly can at any time repeal its charter (Const., Art. 8, §1), and the courts will intervene to prevent it becoming a monopoly. (2) The plaintiff has neither capital stock nor surplus, nor credit, except as given it by the statute, and this latter may be withdrawn at any time. It is wholly dependent upon its ability to borrow in large sums which is necessarily under the control of the Federal Reserve Banking System, and the moment it shall deny credit to the plaintiff its sufficiency would be destroyed. It can borrow from the Federal Reserve System, which is a function of the Government, only on such terms as that board deems consistent with the public welfare, and that board will not permit hoarding or monopolizing by the plaintiff. * * * The plaintiff will continue to exist only if it provides for a normal, orderly marketing of the tobacco crops, and by putting on the markets of the world annually the production of that year. Its sole purpose is by an orderly marketing of the crop to make large saving, and to secure to the producers a fair and reasonable price therefor without increasing the price the consumer will pay for a manufactured article. The sole object to the association is to protect the producer of the raw article from depression in the price by the combination of the large manufacturing corporations, controlled by a few men, who can at the same time not only decrease the price to the producer, but can increase it at will to the consumer, and thereby accumulate in a few hands sums beyond computation. The co-operative association purposes to eliminate unnecessary expenses in selling, and to prevent artificially forced reductions in the price paid to the producers.

Instead of creating a monopoly, the object is by a rational method of putting the raw product on the market from time to time as there is a legitimate demand for its manufacture, and by the extension of credit to farmers enable this to be done, to prevent a monopoly of the tobacco industry by those who manufacture it."

And after calling attention to the contention that the co-operative marketing system was a detriment to the public and that the money of the association would be used in the organization of subsidiary companies to process, redry, store and get the tobacco of its members ready for market, called attention to the conditions existing at the close of the World War and said: "The co-operative marketing system was forced into existence to guarantee fair prices to the producer, a fair wage for labor, and to prevent extortion upon the consumer. It increased consumption, by furnishing the consumer a regular supply at less price, and at the same time enabled the laborer and the farmer to obtain a remunerative return. In addition, the co-operative system eliminated unnecessary expenses and costs, as well as the enormous speculative profits realized by combinations which had taken control of the entire process between the producer and the consumer. * * * It is an entire misunderstanding of the facts to assert that an orderly, systematized co-operation among the producers to prevent a sacrifice of their products and to realize a living wage for the laborer and a reasonable profit for the producers has any analogy to the system by which great combinations of capital have prevented the laborer and the farmer alike from realizing a reasonable reward and a decent living."

It is also to be noted that there is nothing disclosed by the complaint contemplating or authorizing the holding of the products of the members of appellant from the market. The life of the contract was five years,

and any attempt to hold the members' products off the market would be destructive of the very purposes of the association, and if attempted would force the sale in the second year of two years' crop which would be destructive of the organization and bring ruin to its members.

What has appellant done that can be said to be in restraint of trade? It has neither coerced nor suppressed any competition. It has not arbitrarily fixed or maintained prices. It has not been guilty of unfair or fraudulent rivalry. It has not limited production or created an artificial scarcity. It has not impaired quality. It has not decreased wages or the price of materials. The fact that it is large and powerful does not render it an unlawful combination or trust, as mere size and possibility of oppression or other illegal act does not even tend to prove the illegality of a corporation. *United States* v. *United States Steel Corp.* (1917), 251 U. S. 417, 40 Sup. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121. As was said by the Supreme Court of Tennessee in the *Dunn Case:* "Until it is established that complainant has committed an act detrimental to the public welfare, it is a lawful organization and its contracts are not subject to attack." Indeed, it is the expressed public policy of every state enacting a Co-operative Marketing Act that associations organized under such acts shall not be deemed combinations in restraint of trade. Section 27 of the Co-operative Marketing Act of this state, Acts 1925 p. 42, §3688 Burns 1926, reads as follows: "Any association organized hereunder shall be deemed not to be a conspiracy nor a combination in restraint of trade, nor an illegal monopoly; nor an attempt to lessen competition or to fix prices arbitrarily or to create a combination or pool in violation of any law of this state; and the marketing contracts and agreements be-

tween the association and its members and any agreements authorized in this act shall be considered not to be illegal nor in restraint of trade nor contrary to the provisions of any statute enacted against pooling or combinations." Like provisions are to be found in the several marketing acts of the other states. Congress declared a like public policy on the part of the federal government in §6 of the Clayton Act, and the courts of nearly every state with possibly one or two exceptions, when called upon to speak on this question have declared that such organizations as appellant and such contracts as the one here involved are not in violation of public policy or in restraint of trade.

In harmony with the public policy of this state as declared in the Gillaspy case and as crystallized by the legislature when it enacted the Co-operative Marketing Act in 1925, we hold appellant is not a monopoly or combination in restraint of trade and that the contract does not violate the anti-trust statutes of state or nation and is not void as against public policy.

The judgment is reversed with directions to overrule the demurrer to the complaint, with leave to appellant to amend its complaint if it so desires and for further proceedings consistent with this opinion.