# BURLEY TOBACCO GROWERS CO-OPERATIVE ASSOCIATION *v.* ROGERS.

[No. 12,077. Filed January 27, 1926. Rehearing denied May 12, 1926. Transfer denied January 22, 1929.]

470

*Aaron Sapiro, Abe D. Waldauer, P. E. Bear,* and *Ralston, Gates, Lairy, Van Nuys & Barnard,* for appellant. *Curtis Marshall* and *Sulzer, Bear & Bear,* for appellee.

McMAHAN, J.—This is an action by appellant, a non-profit co-operative marketing association organized under the Bingham Co-operative Marketing Act, ch. 1, Acts of Kentucky, 1922, the provisions of which were set out in the opinion in *Dark Tobacco Growers', etc., Assn.* v. *Robertson* (1926), 84 Ind. App. 51, 150 N. E. 106, and will not be repeated here. The contract involved in this case is dated November 14, 1921, and is substantially the same as the contract in the Robertson case, except as hereinafter noted.

In the instant case, the contract was embodied in the association agreement which was signed and executed before the association was incorporated, while the contract in the Robertson case was executed after the incorporation of the association. In that case the contract was executed in Kentucky, that is, it was signed by Robertson in this state, sent to the association in Kentucky, where it was accepted, and, by its express terms, was to be interpreted and enforced according to the laws of that state, while the contract in the instant case contains no agreement that it shall be enforced according to

the laws of any particular state.   The association agreement, which was signed by tobacco growers, including appellee, and covering at least three-fourths of the aggregate production of burley tobacco in Kentucky, Indiana, Tennessee and Ohio in 1920, stated that it was the purpose of the signers to organize a non-profit association, without capital stock, for the purpose of promoting, fostering and encouraging the business of marketing tobacco co-operatively; for reducing speculation; for stabilizing the local tobacco markets; for co-operatively and collectively handling the problems of tobacco growers; and for other pertinent purposes.

Section one of the agreement reads as follows:   "We will become members of the Burley Tobacco Growers' Co-operative Association, a non-profit association, without capital stock, to be organized under the laws of the State of North Carolina.   We agree individually and collectively that the directors of the association to be organized may reincorporate the association under the laws of the State of Kentucky when suitable legislation is enacted in this state."

After giving directions as to the steps to be taken to perfect the incorporation in North Carolina, and for the appointment by the North Carolina association of a committee for the purpose of reincorporating under the laws of Kentucky, if and when a suitable law was enacted in the latter state, the contract contained a marketing agreement, and provided that the subscribers, if requested by the association when organized, would execute a marketing agreement substantially the same as the one set out in the association agreement, or that, at the option of the board of directors, the subscribers would be bound by the terms of the marketing agreement embodied in the association agreement.

The complaint alleges that the organization committee named in the organization agreement organized an asso-

ciation under the laws of North Carolina; a copy of the articles of incorporation and of the laws of North Carolina under which it was organized are set out in the complaint. It then alleges the enactment of the Bingham Act in Kentucky, the appointment of a committee by the North Carolina association for the purpose of reincorporating in Kentucky under the Bingham Act, and the incorporation of appellant in Kentucky, January 11, 1922, a copy of the Bingham Act and of the articles of incorporation under that law being also set out in the complaint. That on January 11, 1922, appellant accepted and ratified the association agreement, including the marketing agreement therein set out, and on January 16, 1922, notified appellee of such acceptance and ratification in accordance with the terms of the organization agreement. That appellee failed and refused to deliver his crop of tobacco for the year 1922, and demanded judgment for liquidated damages and for expenses and attorneys' fees incurred.

Appellee, without having filed a demurrer to the complaint, filed an answer in eight paragraphs, the first of which was a general denial.

Appellant's first contention is that the court erred in overruling its demurrer to the second paragraph of answer which was an answer of no consideration. In support of this contention, appellant says that a reading of the contract which is the foundation of the action shows there was a consideration for the execution of the contract. This contention, however, cannot prevail. An answer of no consideration is always proper in an action on a contract for the recovery of money. The answer in question alleges there was no consideration for the execution of the contract, and appellant, by the demurrer, admits the facts as pleaded in the answer. It has been held in cases where a statute of limitation was pleaded as a defense, that the court

could not look beyond the facts set out in the answer and admitted by the demurrer, to ascertain when the cause of action accrued. *State, ex rel.,* v. *Osborn* (1896), 143 Ind. 671, 42 N. E. 921; *DeArmond* v. *Ballou* (1890), 122 Ind. 398, 23 N. E. 766. We know of no reason why a different rule should be applied in an action on a contract for the recovery of a money judgment when an answer of no consideration is filed. There was no error in overruling the demurrer to this paragraph of answer. See *Beard* v. *Lofton* (1885), 102 Ind. 408, 416, 2 N. E. 129.

The third paragraph of answer alleges that the contract was unilateral and void for want of mutuality. This answer like the answer of no consideration was sufficient in form. For the reasons stated in holding there was no error in overruling the demurrer to the second paragraph of answer, we hold there was no error in overruling the demurrer to this paragraph of answer.

Paragraphs Nos. 4 and 4½ allege and are based upon the theory that there is no law in this state under which a domestic corporation could be incorporated in this state to do business, and execute and enforce contracts like the one sued on, for which reason it is alleged the contract sued on is illegal and void, and that appellant has no standing in the courts of this state to recover liquidated damages or to maintain an action for a pretended breach of the contract. In *Dark Tobacco Growers', etc., Assn.* v. *Robertson, supra,* we had occasion to review the statutes of this state authorizing the incorporation of co-operative associations under the voluntary association act, as authorized by §5283 Burns 1926, §4359b Burns 1914. We there held that the business which appellant was engaged in was a lawful business and that a corporation could have been incorporated in this state to transact and do that business. On the authority of that case we hold the court erred in over-

ruling the demurrer to each of said paragraphs of answer Nos. 4 and 4½.

The fifth paragraph of answer alleges, in substance, that appellant was a corporation organized under the laws of Kentucky; that, under the contract sued on and under its said incorporation, appellant had the power and authority to create warehousing corporations in other states, to lease, purchase, and construct warehouses, drying, and manufacturing plants and do other things in order to carry out its corporate aims and purposes; that, in order to carry out a part of its corporate purposes and said contract, appellant had a subsidiary warehousing corporation known as the "Indiana District Warehousing Corporation" incorporated in this state; that appellant agreed to and did guarantee the payment of dividends on the preferred stock of such corporation; that such warehousing corporation had the power to lease, operate, and erect warehouses, receive tobacco for storage, issue warehouse receipts, and that appellant, through said subsidiary corporation, purchased and holds several parcels of real estate in connection with the business of said subsidiary corporation, all of which acts appellant had authority to do under the laws of Kentucky and under its articles of incorporation. That appellant was and is a corporation organized for profit and had not complied with the laws of this state authorizing foreign corporations organized for profit to do business in this state and, for that reason, had no power to execute the contract sued on.

The theory of this paragraph is that appellant is a corporation organized for profit and had not complied with the laws of this state authorizing foreign corporations for profit to do business in this state. Appellee concedes that appellant was properly incorporated under the Kentucky statute and does not question its right to do business in that state under the Bingham Act. No

contention is made that appellant was not, under its articles of incorporation, authorized to enter into the contract sued on and to do all the business which it is alleged to have done. Appellant, being properly incorporated and the law of the state where incorporated and its articles of incorporation having given it power and authority to make the contract, we cannot agree with the contention that the contract sued on was void when made.

Appellee in this cause, as did appellee in the Robertson case, insists that a nonprofit corporation could not, under the statutes of this state, have been incorporated to do the business appellant was doing in this state, and therefore, appellant, as a nonprofit corporation could not have been authorized to do business in this state, and that the contract in question is void under §4918 Burns 1926, §4094 Burns 1914, which makes it unlawful for a foreign corporation for profit to do business in this state without having first received a certificate from the secretary of state authorizing it to transact business in this state. We hold, however, that appellant is a nonprofit corporation, and that the statute referred to by appellee is not applicable. The demurrer to this paragraph should have been sustained.

The sixth paragraph of answer, in substance, alleges that appellant was organized and the contract entered into for the purpose of creating a monopoly or trust in restraint of trade, and that the contract is void for that reason. Appellee calls attention to *Baldwin County Producers Corp.* v. *Frishkorn* (1919), 17 Ala. App. 84, 81 So. 862, and *Reeves* v. *Decorah Farmer's Cooperative Society* (1913), 160 Iowa 194, 140 N. W. 844, 44 L. R. A. (N. S.) 1104, in each of which cases a contract similar to the one in controversy was held to be in restraint of trade. In so far as the first case is concerned, all we need say is that the Supreme Court, on appeal, reversed the Court of

Appeals and held the contract was not in restraint of trade. See *Ex parte Baldwin County Producers' Corp.* (1919), 203 Ala. 345, 83 So. 69. In this connection, we call attention to the recent case of *Warren* v. *Alabama Farm Bureau Cotton Assn.* (1925), 213 Ala. 61, 104 So. 264, where the Supreme Court of Alabama, in a well-considered case, in upholding the validity of a contract in all respects like the one now under consideration against the same objections as are urged by appellee in the instant case, in speaking of public policy, said: "So far as public policy is concerned, it is primarily determined in every state by the acts of its Legislature; no provision of its constitution forbidding. *Denson* v. *Ala. F. & I. Co.*, 198 Ala. 383, 391, 73 So. 525. When the Legislature thus speaks, whether it be governed by age-old principle or by merely ephemeral expediency, it eliminates the question of public policy from the cognizance of courts in their administration of the legislative act. As a matter of fact, while some of the fundamentals of public policy will probably remain unchanged through all the ages, public policy is generally affected by the changing value of expediency; and hence a public policy which in one age prescribes certain conduct as injurious to the public welfare may in a later age, under changed economic and social conditions, wisely and justly tolerate, if not encourage as beneficial, the identical conduct. . . . Co-operative marketing associations, composed of the growers of agricultural or fructicultural products, are now to be found in many of the states, and in every section of the country. Their origin and growth are unquestionably founded upon a pressing economic necessity. . . . So far as we are advised, no American court has condemned a co-operative marketing contract of the character of this complainant association as injurious to the public interest, or in any way violative of public policy. On the contrary, such contracts have been

everywhere upheld as valid, if not positively beneficial to the public interest."

The Reeves case involved a marketing association quite different from that of appellant. The association there was an association organized for pecuniary profit in which voting was allowed on the basis of stock ownership, instead of limiting each member to one vote as is the case with appellant association. That association bought from and sold to both members and nonmembers; it operated in the open market; both growers and nongrowers were members. The Supreme Court of Iowa, in the Reeves case, in speaking of the association there involved, said: "This society was something more than a mere selling agency. It not only acted as seller, but also purchased, in the open market, from members and nonmembers, alike, save as heretofore stated. . . . Of course, a mere selling agency is not a monopoly, and neither the common law nor the anti-trust statute applies to a genuine selling agency."

In *Jackson* v. *Stanfield* (1894), 137 Ind. 592, 36 N. E. 345, 23 L. R. A. 588, the retail lumber dealers of this state had formed an organization, the object of which was to restrict the liberty of wholesalers to sell to consumers and brokers, and to prevent consumers and brokers from buying lumber from wholesalers and is not applicable to the facts in this case.

The rule of reason must be applied in determining whether a contract is in restraint of trade and whether it creates a monopoly. Originally, all contracts in restraint of trade were held to be illegal, but the rule now seems to be that such contracts are not illegal except when unreasonable in character, and that when such contracts are incident or ancillary to some lawful purpose, and are not unreasonable in their scope and operation, they are not illegal. *Reeves* v. *Decorah Farmers Cooperative Society, supra.* As was said in

*Brown* v. *Staple Cotton Assn.* (1923), 132 Miss. 859, 96 So. 849, 855: "There must be an unreasonable or undue restraint of trade . . . as is detrimental to the public interest." To the same effect see *Paragon Distributing Corp.* v. *Paragon Laboratories* (1925), 99 N. J. Eq. 224, 129 Atl. 404.

The expressed public policy of this state, as disclosed by this court and the General Assembly, is to aid and encourage the co-operative marketing of farm products. *Burley Tobacco Society* v. *Gillaspy* (1912), 51 Ind. App. 583, 100 N. E. 89; Acts 1925 p. 42. The organization of co-operative marketing associations, and the entering into marketing contracts between such associations and their members, appear to be an economic necessity, and it would be turning the wheels of progress backward to hold such contracts in restraint of trade, when, in fact, the effect and purpose of such contracts are to effectuate an orderly and economic method of marketing farm products, not merely in the interest of the producers, but in the interest of the general public as well. When the courts of every state where the validity of statutes authorizing the organization of co-operative marketing associations, or the co-operative marketing contracts between such associations and their members have been assailed, have held such organizations and contracts legal, it would seem that the validity of such legislation and contracts was no longer an open question. Such organizations and contracts have been upheld by the courts of Alabama, California, Colorado, Kansas, Minnesota, Kentucky, Mississippi, Nebraska, New York, North Carolina, Tennessee, Texas, Washington and Wisconsin. For a further discussion of this question, see the Robertson case, where we held that a similar contract was not illegal on the ground that it was in restraint of trade. On the authority of that case, we hold the court erred in overruling the demurrer to the

sixth paragraph of answer. For other cases supporting our conclusions see *Kansas Wheat Growers Assn.* v. *Schulte* (1923), 113 Kans. 672, 216 Pac. 311; *Dark Tobacco Growers' Co-op. Assn.* v. *Mason* (1923), 150 Tenn. 228, 262 S. W. 60; *Hollingsworth* v. *Texas Hay Assn.* (1922), 246 S. W. (Tex. Civ. App.) 1068; *Tobacco Growers' Co-operative Assn.* v. *Jones* (1923), 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; *Oregon Growers', etc., Assn.* v. *Lentz* (1923), 107 Ore. 561, 212 Pac. 811.

The seventh paragraph of answer is based upon the theory that appellee's signature to the association agreement was obtained by fraud. This paragraph alleges that the promotors of the proposed association sent speakers and agents throughout the tobacco-growing districts, including Indiana, and that these alleged agents falsely stated, both publicly and privately, to the tobacco growers that they had taken over all the tobacco warehouses and the loose-leaf houses in Indiana and elsewhere and had secured agreements with all the tobacco-manufacturing companies to the effect that if the proposed association got tobacco growers growing three-fourths of the tobacco production of the states of Tennessee, Ohio, Kentucky and Indiana to sign the contract, such manufacturers would not send out buyers to the loose-leaf markets, but would buy their tobacco direct from the association. This is followed by allegations as to what these agents said would result if the association was formed. Many other statements are alleged to have been made, but they were mere matters of opinion as to what would happen in the future if such an association of tobacco growers were organized, such statements being, in substance, that such association could handle the tobacco with less expense to the growers, and that the growers would get a better price for their tobacco. Complaint is also made of the conduct of the affairs of the association after its organization. The

complaints of the manner of conducting the affairs of the association after its organization are not such statements and acts as will form the basis of a charge of fraud.

It is alleged that certain statements were made to the effect that the association, each year upon the delivery of the tobacco, would pay the grower in cash fifty per cent. of the fair value of his crop and that it did not do so. Any agreement of this kind, if made, was made prior to the signing of the agreement, and it is well settled that all prior oral agreements are merged in the written agreement.

Many of the allegations of this answer relate to and are denials of certain steps preliminary to incorporation which the complaint alleges were taken and which had no place in an answer of fraud.

There is no allegation in the answer that appellee was present at any public meeting at which any agent or representative of the promoters of the proposed association spoke; that any person ever said a word to him or within his hearing concerning the matter, or that he was misled by anything that any one said to him. The memorandum filed with the demurrer, however, does not call attention to the failure of the answer to allege the presence of appellee at any of the public meetings or that any one with authority made any statements to him or in his hearing that he was justified in relying on. Such defects in the answer are therefore waived in so far as the question now before us is concerned but we deem it best to call attention to such defects, as such waiver on the part of appellant relates only to the action of the court in ruling on the demurrer. Such waiver, however, does not dispense with proof of facts sufficient to sustain a defense of fraud.

In passing upon the sufficiency of this answer to with-

stand a demurrer, we must ignore all the allegations therein relating to matters of opinion, agreements alleged to have been made, but not inserted in the written contract, and the allegations concerning the conduct of the affairs of the association after incorporation. This paragraph of answer, when stripped of the immaterial allegations, contains but one allegation of an existing fact.

The only allegation that can be construed as an allegation of an existing fact is the allegation that the promoters of appellant association sent out speakers and agents "who falsely and fraudulently represented and stated, both publicly and privately, to the tobacco growers of said states, the following: *that they had purchased all the tobacco warehouses and all the loose-leaf houses in Indiana and elsewhere*" (our italics) and that they had secured an agreement with all the tobacco-manufacturing companies which sent out buyers over the loose-leaf floors and otherwise, in this state and elsewhere, that if the proposed association should be incorporated and get tobacco growers growing three-fourths of the tobacco production in the state named, they would not send out buyers, but would buy their tobacco from the proposed association. These allegations relate to present existing facts and are not open to the objection that they relate to promises as to what will transpire in the future, or to the conduct of the business of the association after incorporation. None of the objections stated in the memorandum filed with the demurrer are applicable to these allegations, except the contention that they were made by persons having no authority so far as the association is concerned; that the persons making them were not agents of the association, as the association was not at that time in existence; and that the statements of these speakers, made for the pur-

pose of procuring subscribers to the association, did not bind the association when organized.

Appellant contends that fraudulent representations made before incorporation by promoters or their agents are not binding on the corporation unless it accepts the contracts with actual notice of the statements. In *Pittsburgh, etc., Mining Co.* v. *Quintrell* (1892), 91 Tenn. 693, 20 S. W. 248, cited by appellant in support of this contention, Quintrell sued the corporation upon a contract of employment alleged to have been made before incorporation with one of the promoters of the proposed corporation. The court, in an opinion by Lurton, J., later associate justice of the United States Supreme Court, in discussing the question there involved, said: "While there can be no doubt that Shaffer intended to employ plaintiff for the proposed corporation, and to bind it by his contract when it should come into existence, yet it is very plain law that a corporation is not responsible for acts performed or contracts made, before it came into existence, by promoters or persons proposing to bind the company when it should be organized. A corporation not in existence can have no agent. The law of agency implies a principal capable of being represented by an agent of his own appointment. It follows, therefore, that Shaffer could not have been the agent of this corporation when he made this contract, whether he made it on the tenth or on the twentieth of May. Morawetz, Corporations, and cases cited by him to Sec. 547. But the law is equally as well settled that a contract made in advance of incorporation may be adopted after organization, and thereby become the contract of the corporation. The liability, in case of adoption, does not rest upon the idea of any supposed agency of the promoters, 'but upon the immediate and voluntary act of the company.' Morawetz, Sec. 548." The court, however, held the

evidence of adoption was sufficient to support a verdict holding the corporation liable.

The objection to this part of the paragraph of answer, as set out in the memorandum filed with the demurrer, is as follows: "First, that at the time they were alleged to have been made, as shown by the answer of the defendant, they were made by persons who had no authority so far as the corporation was concerned to make them, and they were not the agents of the corporation, as the answer shows; further, that the corporation was not in existence at that time, and they were made long before any corporation was ever formed, and this corporation would not be bound by anything that these persons said by way of procuring these subscriptions, unless the contract itself was ratified by the corporation itself, and which fact of the ratification is denied in this answer by the defendants and, if ratified, then the defendant would be bound by it because of the fact that he never at any time notified the corporation that he did not intend to be bound by it, or that he rescinded the same or offered to rescind the contract sued on herein."

In that part of its brief devoted to Propositions and Points relied on for reversal, appellant has made no objection to the answer on the grounds quoted from the memorandum. The objections to the allegations concerning the statement that the promoters had taken over the warehouses and had an agreement with the tobacco growers are therefore waived. Furthermore, appellant in its memorandum did not object to the answer on the ground that statements made before incorporation by the promoters were not binding on the corporation after incorporation. And we hold, as against the objections stated in the memorandum and presented by appellant's brief, there was no error in overruling the demurrer to the seventh paragraph of answer.

Appellant's last contention is that the court erred in carrying the demurrer back and sustaining it to the complaint. This contention in our judgment must be sustained. This question was fully discussed in *Dark Tobacco Growers', etc., Assn.* v. *Robertson, supra,* and, on the authority of that case, we hold the court erred in sustaining the demurrer to the complaint. But in view of appellee's earnest contention that the contract sued on is not enforceable for want of consideration, we deem it proper to say something on that question.

It is elementary that the promise of one party is a valid consideration for the promise of the other party. In the contract sued on, appellant made a number of valid promises. It agreed to buy all of the tobacco produced by appellee for a period of five years, naming the years, and by necessary implication, it agreed to accept the delivery of the tobacco for a like period. It agreed to make rules and regulations and provide inspectors to grade, standardize and classify the tobacco. This was essential to proper marketing, not only of the tobacco raised by appellee, but of the pools of tobacco in which that grown by him was to be placed. It agreed to pool the tobacco of appellee with similar tobacco of other growers. This promise was of financial benefit to appellee in enabling him to obtain whatever increase in price a sale of that character might bring. It enabled him to obtain a beneficial interest in the net proceeds of all tobacco placed in the pool with his own. Appellant agreed to make a reasonable effort to sell the tobacco in a manner named at the best possible price. This was also of direct financial interest to appellee, in that the price he was to receive for his tobacco depended upon the action of appellant in selling the tobacco for the best possible price. There are other promises of appellant in the agreement, but those pointed out are

sufficient. Appellee not only obtained the promise of appellant as to the matters stated above, but since it is plain that the tobacco of himself and other growers was to be pooled with other tobacco, similar in class, and that many other growers had agreed that their tobacco might be placed in the pool with appellee's tobacco, and that the payment for the tobacco was to be from the proceeds of the pool, it is clear that a consideration moved, not only from appellant, but from each of the growers signing the contract, to the extent that each grower surrendered his exclusive beneficial interest in any dominion and control over his individual tobacco and obtained in lieu thereof a beneficial interest in the proceeds of the pool in which his tobacco might be placed.

This contract on its face conclusively shows as a matter of law that it is not subject to objection on the grounds of want of consideration, want of mutuality, or that it is unilateral. *Texas Farm Bureau Cotton Assn.* v. *Stovall* (1923), 113 Texas 273, 253 S. W. 1101; *Dark Tobacco Growers', etc., Assn.* v. *Robertson, supra.* In case of a trial of this cause by a jury, it would, upon the introduction of the contract in evidence, be the bounden duty of the court to instruct against the defendant on the issues of no consideration, want of mutuality, and on the claim that the contract is unilateral.

Judgment reversed, with directions for further proceedings consistent with this opinion, with leave to both parties to amend their respective pleadings if desired.